GAIN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                          CASE NO. 15- 03837 (ESL)

THE HORNED DORSET PRIMAVERA, INC.               CHAPTER 11

          Debtor

OPINION AND ORDER

This case is before the court upon the United States Trustee's (hereinafter referred to as "UST") *Motion to Dismiss or Convert to Chapter 7 pursuant to §1112(b) and Memorandum of Law* filed on September 14, 2018 (Docket No. 488). The UST in its motion to dismiss or convert contends that this case should be dismissed or converted for "cause," whatever is in the best interest of the creditors and the estate, pursuant to 11 U.S.C. §1112(b)(4)(A) because the estate is suffering substantial or continuing loss, and there is an absence of a reasonable likelihood of rehabilitation. The UST argues that the Debtor does not appear to generate enough income to satisfy all of its operating expenses and the estate appears to be administratively insolvent. Thus, the estate is suffering substantial or continuing losses and/or diminution. The UST further argues that the Debtor lacks a reasonable likelihood of rehabilitation due to the following: (i) the net losses it has sustained during its three years in bankruptcy will prevent it from paying the substantial priority claims that have been filed. The same have to be paid by May 2020 pursuant to 11 U.S.C. §1129(a)(9)(C). The Debtor has been in bankruptcy for over 39 months, and has failed to generate the necessary profits to satisfy all of the priority and administrative claims that have been filed against it; (ii) it is highly unlikely that Debtor will be able to prevail in its collection action against ITC in adversary proceeding No. 16-00156; and (iii) Debtor's other

-1-

alternative, liquidation through the sale of its usufruct and real property rights, by definition means that it will not be able to rehabilitate. Debtor filed its *Opposition to "Motion to Dismiss"* on October 2, 2018 (Docket No. 497). The Debtor in its opposition contends that the UST did not meet its burden of proof and contrary to the UST's assertion there is no substantial or continuous diminution of the estate and the Debtor has been paying its debts as they become due. Creditors Francisco Domenech and Veronica Ferraiuoli filed a *Motion Joining the Request for Dismissal* by the UST and also request a bar to re-file of two years (Docket No. 543). The Debtor filed its *Opposition to Motion to Dismiss* (Docket No. 547) and argues that the creditors failed to plead proper cause as to the bar to refile. For the reasons set forth below, the UST's motion to dismiss pursuant §1112(b) is hereby granted.

Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

Procedural Background

The Debtor filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on May 22, 2015. The Debtor included in Schedule A- Real Property- the following interests in property: (i) the right to acquire the land remnant ("derecho de retracto") over property located in Rincón with a value of $5,000,000; (ii) the right of usufruct for thirty (30) years of the exclusive possession of the main buildings, the service structures and all surrounding common areas, and access roads with a value of $1,800,000; and (iii) the right of easement over neighboring property with a value of $1,000,000. The Debtor lists in Schedule B- Personal Property- a note receivable from the sale of property to Inmobiliaria T&C Inc. (hereinafter referred to as "ITC") dated July 19, 2005 in the amount of $8,080,000.

On July 22, 2016, the Debtor filed an adversary proceeding (Adversary proceeding No. 16-00156) against ITC for breach of contract and collection of monies. The Debtor/Plaintiff

alleges that ITC has defaulted on two (2) promissory notes. The first promissory note became originally due and payable on July 19, 2006 and it was extended thereafter to July 19, 2010. ITC allegedly owes Debtor/Plaintiff the principal sum of $4,060,000 plus default interest of 7% per annum, which as of May 31, 2016 amounts to $1,648,360.00, and whose default interest continues to accumulate at the rate of $778.63 per diem. The second promissory note became originally due and payable on July 19, 2009 and it was extended thereafter to July 19, 2010. ITC under the second promissory note allegedly owes Debtor/Plaintiff the principal amount of $4,000,000 plus $1,624,000 for default interest which continue to accrue at the rate of $767.12 per diem. The Debtor/Plaintiff requests in the alternative, that the Defendant render the amounts owed under the first promissory note and that title of all remaining real estate revert to the Debtor (Docket No. 221).

On September 14, 2018, the UST filed a *Motion to Dismiss or Convert to Chapter 7 pursuant to §1112(b) and Memorandum of Law* (Docket No. 488).

On October 2, 2018 the Debtor filed its *Opposition to "Motion to Dismiss"* arguing the following: (i) the UST failed to meet its initial burden of proof; (ii) "… the UST's motion is devoid of any evidence that there has been (1) a substantial diminution of the estate, (2) that such alleged diminution is sufficiently large, and (3) that it materially impacts the creditors of this case;" (iii) "[t]he UST attempts to persuade the Court that dismissal is warranted because, during the past months, during low season, the Debtor has had a negative cash balance of a mere $743 on average." The high tourist season commences in late December during wintertime, and the low season is during summertime. "Nonetheless, with the upcoming high season the Debtor will recoup its losses, which are minimal considering the nature of businesses engaged in tourism endeavors. As it will be established through the testimony of the Debtor's officials, several bookings for high season have already been made and prepaid, for which the prospect of higher cash inflow during the next months is not speculative;" (iv) after hurricane María, the Debtor had no electricity for months and operated using a power generator. However,

the Debtor was billed a considerable amount for electricity it did not receive from PREPA. The Debtor is in the bill objection process pursuant to Act No. 143-2018; (v) the Debtor reached a payment agreement with PRASA and is current with such agreement; and (vi) contrary to the UST's assertion, there is no substantial diminution of the estate and the Debtor has been paying its debts as they become due (Docket No. 497).

On October 5, 2018, the UST filed its *Report in Compliance with Order at Docket No. 489* contending that in this case there is cause to dismiss or covert this case to Chapter 7 pursuant to 11 U.S.C. §1112(b)(4)(A) because there is a continuing loss to or diminution of the estate and the same is evidenced by the following: (i) the monthly operating reports for the months of February 2018 to July 2018 reflect a net loss of $4,459. The July 2018 report reflects a negative cash balance of $460 (Docket No. 474); (ii) the monthly operating reports from May 2015 to July 2018 disclose that the Debtor has suffered a net loss of $20,964; (iii) the Debtor has been unable to satisfy its post-petition payables in the amount of $112,576, that includes water and electricity services; and (iv) the Debtor's recoverability of its accounts receivable against ITC is seriously in doubt, given the controversy over its lien priorities and Debtor's failure to prosecute the adversary proceeding (Docket No. 498).

The UST argues that it has satisfied the second prong of 11 U.S.C. §1112(b)(4)(A) that is, whether there is "any reasonable likelihood that the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time," due to the following: (i) the Debtor has been in bankruptcy for over 39 months and has failed to generate the necessary profits to satisfy all the priority and administrative claims that have been filed against it; (ii) the Debtor's other route for rehabilitation would require that it prevail in its adversary proceeding against ITC. The possibility of recovering any amounts from said proceeding are slim and speculative. The prospect of rehabilitation must be premised on objective facts, and not merely speculative data; (iii) "…the failure to resolve the controversy surrounding Debtor and PRCI's liens over the

Hotel Property means that Debtor will have to continue to incur substantial professional fees to litigate the issue, on top of the over a quarter million dollars it has paid out so far;" and (iv) Debtor lacks any objective ability to rehabilitate, either through a profitable hotel business or collection of its account receivables, it is left with no other option but to liquidate. Thus, rehabilitation is not reasonably likely, and the second prong of §1112(b)(4)(A) is met (Docket No. 498).

On October 8, 2018, the Debtor filed its *Pre-Trial Report for U.S. Trustee's Motion to Dismiss* arguing the following: (i) "[t]he fact that the Debtor's plan of reorganization has not been confirmed has nothing to do with the Debtor itself, but rather the complexity of the controversies in this case;" (ii) The Debtor's position regarding its negative cash flow balance and that it has accrued post-petition debts with the utility companies is that, "… the alleged outstanding debt has not matured because they are in the process of being objected in the corresponding state administrative forums and that negative cash flow is common in the tourism industry for low season for which there is no diminution to the estate. "… even if we assume, *in arguendo*, that such debts have matured. The parties directly affected by such alleged diminution have not moved for dismissal nor have they joined in the U.S. Trustee's request for dismissal;" (iii) the UST lacks evidence to establish at a *prima facie* level that there is a diminution to the estate pursuant to 11 U.S.C. §1112(b)(4)(A) because the UST does not admit to the value of the stated assets as stated by Debtor in its Schedules A and B, and if it does not proffer any expert testimony to establish the value of the estate, it is unable to prove its case; (iv) there has not been a substantial or continuous diminution to the estate because (1) the lodging and tourism industry in Puerto Rico is seasonal and (2) the supposed diminution is neither substantial nor continuous. "It is normal for hotels in this industry to have negative cashflow during summer time because it is low season. Within the lodging industry, the cash inflow from high seasons is enough to recover from the negative cash flow during low seasons and to cover the operational expenses during the high season;" (v) "[t]he Debtor's assets as

listed in the schedules, to this day, remain the same and have not diminished. If the U.S. Trustee intends to establish that there has been a diminution in the Debtor's assets, the U.S. Trustee needs to provide admissible expert evidence to support such fact by preponderance of the evidence, such as an appraisal;" (vi) "….the alleged negative cash flow is neither substantial or continuous. Considering that the damages that hurricanes Irma and María did to Puerto Rico and its tourism industry, an average negative monthly cash flow of $735, during low season, is not substantial nor large enough to have a negative impact of the estate. Particularly, when the high season is about to commence and the Hotel's booking for winter seasons are high;" (vii) the Debtor has a payment arrangement with PRASA and is up to date with the same. The PREPA debt has not matured in view of pending objections due to the Debtor being charged post hurricane Maria for electricity consumption it did not receive from PREPA. The Debtor will have the necessary funds to pay such during the high season as it is normal within the industry standard; and (vii) claim number 18 in the amount of $350,000 is just another unsecured claim until the court approves the same as an administrative claim. Notwithstanding, this claim does not affect the estate because the Debtor's insurance policy covers such claim up to $1,000,000 per claim (Docket No. 500).

The evidentiary hearing was held on October 9, 2018 and the same was continued to October 11, 2018. On October 9, 2018, the court heard the testimony of CPA José A. Cuevas Sánchez, Esq., Iliana Payano; and Mr. Bechara. On October 11, 2018, the court heard the continuation of the testimony of CPA José A. Cuevas and the testimony of Mr. Wilhelm Sack. On October 25, 2918, the court heard the continuation of the testimony of Mr. Sack and the testimony of CPA Pedro Juan Rivera Concepción. The court ordered the parties to file proposed findings of fact and conclusions of law within thirty (30) days (Docket Nos. 508, 511 & 519).

On October 17, 2018, the court entered *sua sponte* an *Order re Small Business Designation* considering the strictures in sections 1121(e) and 1129(e) and that no request for an extension of time had been made by the Debtor pursuant to section 1121(e), therefore requesting

the Debtor to show cause within 21 days as to why the case should not be dismissed under section 1112(b) given that the case was filed in the year 2015 and a chapter 11 plan had not been confirmed (Docket No. 512). On November 7, 2018, the Debtor filed its *Response to Show Cause and Motion for Leave to Amend Petition* (Docket No. 526). Given the extensive travel of this case, and that the Disclosure Statement and Chapter 11 Plan of Reorganization dated February 24, 2016 were filed in this case (Docket Nos. 142 & 143), and this court entered an Order and Notice scheduling the hearing on the Disclosure Statement on May 17, 2016 (which exceeds the 45 days in which the plan must be confirmed pursuant to 11 U.S.C. §1129(e) (Docket No. 146) and on said hearing continuing the same without a date due to pending objections to claims. Moreover, the Debtor was granted thirty (30) days after pending objections to claims are decided to file amended disclosure statement and amended chapter plan, if necessary (Docket No. 177). The court opts to adjudicate the UST's motion to dismiss on the merits, rather than on the small business dismissal provisions, for judicial efficiency reasons, and the issue has not been raised by any party in interest since 2015 when the petition was filed.

## Uncontested Material Facts

The parties agree that the following material facts are uncontested (Docket Nos. 498 & 500):

1. Debtor filed its voluntary petition under Chapter 11 on May 22, 2015 (Docket No.1).

2. Debtor in its Schedule A, disclosed three "real properties:" (1) a right to acquire land remnant, located at Road 429, Km. 3.0, Barrio Barreo, Rincon, PR, valued at $5,000,000; (2) a thirty (30) year right of usufruct over the real property where Debtor operates the Horned Dorset Primavera Hotel (the "Hotel Property"), valued at $1,800,000; and (3) a "right of easement over neighboring property," valued at $1,000,000 (Docket No. 1).

3. Debtor in its Schedule B, disclosed $8,858,887 in personal property, including

the following: (i) $48,250 in several bank accounts; (2) an account receivable of $8,080,000 from Debtor's 2005 sale of the Hotel Property to ITC (sold in exchange for monetary consideration and the thirty (30) year usufruct disclosed on Schedule A; (3) an account receivable of $627,541, from hotel and villa guests; (4) $142,667 in hotel equipment, furniture and inventory; and (5) an "unliquidated credit to certain owner of residence pursuant to lease contract" valued at $56,429.

4. According to the docket and claims registry, Debtor has approximately $1,406,297 in priority claims, including the following: (1) a $1,113,173 priority claim by the P.R. Tourism Company, as adjudicated by the Court at docket no. 448, and pending reconsideration requested by Debtor; (2) a $178,625 priority claim by the P.R. Treasury Department, filed as proof of claim #17-3; (3) a $40,978 priority claim by the State Insurance Fund filed as proof of claim #13-1; and (4) a $33,588 priority claim by the Internal Revenue Service, filed as proof of claim #8-6.

5. The monthly operating reports that have been filed, covering the months of February 2018 to July 2018 disclose that the Debtor has suffered a net loss of $4,459 in said six (6) month period, for an average net monthly loss of $743.

6. The Debtor received the amount of $200,191 from an insurance company for "business interruption" (Docket No. 463, at pg. 3).

7. The monthly operating report for July 2018 discloses that Debtor's ending cash balance for that month was in the amount of negative ($460) (Docket No, 474).

8. Debtor initiated adversary proceeding no. 16-00156 by filing a complaint against ITC seeking to collect the amount of $11,332,360, due under the purchase agreement whereby ITC acquired the Hotel Property in the year 2005. (Adversary Proceeding No. 16-00156, Docket No. 1). In the alternative, Debtor requested that the Court revert title of the real property to it, as allegedly required under the terms of the agreement in the event that ITC defaulted on said payment.

9. During the pendency of this case, the Debtor has incurred the amount of $276,978 in professional fees.

10. The operating report for the July 2018, discloses that since the filing of the petition a total of $268,237 has been paid by Debtor for professional fees (accounting & legal) (Docket No. 474, pg. 2).

11. The UST has proposed findings of facts at Docket Nos. 498, pgs. 4-7 & Docket No. 528, pgs. 1-27: based on the testimony provided at evidentiary hearing. The Debtor did not file proposed findings of facts, instead the Debtor filed its closing argument (Docket No. 527).

**Arguments of the parties**

UST's argument in a nutshell: The Debtor has been in bankruptcy for almost three and a half years and thus far has accumulated a negative cash flow. The Debtor also has $1.4 million in priority claims that have been filed and based on the Debtor's negative cash flow there is no way that the Debtor will be able to confirm a Chapter 11 plan and pay all of its priority claims within the five (5) year period required by the Bankruptcy Code.

The estate is diminishing and/or suffering from substantial and/or continuous losses and the Debtor lacks the reasonable likelihood to rehabilitate. The UST also moves for dismissal or conversion pursuant to 11 U.S.C. §1112(b)(1) because of the lack of possibility of prompt resolution in this case and a successful exit from bankruptcy by the Debtor. Section 1112(b)(4)(A) establishes that the movant must satisfy two prongs; namely, (1) demonstrate continuing losses or a substantial diminution of the estate, and according to case law rendered by this court all that is required is a negative cash flow is sufficient showing for continuing loss (In re Plaza Antillana, Inc., 2014 Bankr. Lexis 634 (Bankr. D.P.R. 2014) and In re Peña, 2016 Bankr. Lexis 824, 2016 WL 1043736 (Bankr. D.P.R. 2016)). The monthly operating reports show that since May 2015, the Debtor has lost approximately $20,000. The latest monthly operating report discloses that the Debtor has accrued post-petition payables exceeding

$100,000. Also, the docket of the case reflects that over $250,000 have been granted by this court in professional fees and expenses. The second prong of section 1112(b)(4) is whether the Debtor has a lack of a reasonable likelihood of rehabilitation. The test is whether the future cash flow that it may generate in the future is enough to pay the priority claims and other claims that have been filed in this case. In this particular case, the priority claims are in the amount of $1.5 million, which the bankruptcy code requires to be paid in five (5) years from the date the bankruptcy petition was filed. In this case, there is no possibility of the Debtor being able to generate sufficient cash flows to satisfy the priority claims. The Debtor according to our calculations would have to generate almost $70,000 in monthly net income to satisfy the priority claims in the amount of $1.4 million within the twenty (20) month period that is left of the five (5) year period. Also, the Debtor in this case filed an adversary proceeding against the titleholder of the Hotel Property seeking a monetary judgment in the amount of $11 million from said corporation. The court can take judicial notice that nothing has been filed in this particular adversary proceeding since March 2017. The testimony that the UST will present from the president of that corporation establishes that said corporation does not have the financial means to satisfy the Debtor's $11 million claim. Thus, the Debtor's hopes of reorganizing by being able to satisfy a monetary judgment against ITC is speculative and remote. The court can also take judicial notice from the litigation in the case that there is a controversy as to the liens over the Hotel Property in which PRCI is the mortgage creditor arguing that its mortgage notes should have precedence over the Debtor's usufruct lien that apparently encumbers the Hotel Property in a superior rank to that of PRCI's mortgages. This controversy has made it difficult for the parties in question to market the property and will also make it difficult for the Debtor to propose a liquidation plan by selling its real property rights over the Hotel Property, even if it wins the case against ITC. In addition, the property appears to have suffered damages as a result of Hurricane Maria, which has resulted in the Debtor not being able to maximize its occupancy rate because several of the residences and villas were damaged and are currently not habitable due to the

damage suffered. There is no insurance that will cover said damages and this will adversely impact the Debtor's ability to reorganize the case. Therefore, the court should dismiss or convert this case to chapter 7 whichever it finds is in the best interest of the creditors as the Debtor will not be able to reorganize under Chapter 11 as required by the Bankruptcy Code. Allowing this case to continue would permit the Debtor to remain in bankruptcy while indefinitely enjoying the protection from the automatic stay without any viable exit strategy without being able to generate enough income to pay its priority claims and without having a plan to liquidate the estate and while continuing to accrue substantial professional fees in the case. In conclusion, the argument is submitted.

The Debtor stated that the movant needs to establish the first part of the test which is that there has been a substantial diminution or continuous diminution of the estate. The UST pre-trial report lacks any evidence that there is a substantial diminution. The UST merely recites the Debtor's scheduled assets in Schedule A and B, but then it does not accept its value. Diminution requires that there be a change in the value of the properties. The UST does not have any evidence as to the assets' pre-petition value and the value of those assets today, thus it cannot establish that there is a diminution in assets without expert testimony. As to continuous diminution, the Debtor's position is that the negative cash flow balance in the monthly operating reports is insignificant and during the pendency of three years it is negative $4,000 approximately. Moreover, the hotel industry is cyclical, meaning that winter season is the high season and the latest monthly operating report shows a positive cash flow balance of approximately $400. Negative cash flow balances during low season is normal. Therefore, the first prong has not been met and thus, there is no need to establish the second prong. Moreover, regarding the second part of the test, the UST claims that since a defendant in an adversary proceeding claims to be insolvent it means that the Debtor will not be able to rehabilitate. As to the testimony regarding this matter, the Debtor's position is that it is self-serving testimony because it is normal that anybody that is being sued will claim that they do not have money.

-11-

Notwithstanding, the Debtor in the adversary proceeding is requesting that if ITC does not pay them, then pursuant to the contract, then the property will revert to the Debtor. If ITC is insolvent, then the Debtor gets the property. The property was appraised at $14 million which is greater than the mortgages that encumber the same, thus the value of the estate will increase substantially.

The case docket shows that there have been unusual circumstances. This has been a very litigated case with priority creditors, general unsecured creditors and non-creditor parties. The litigation has benefitted the estate because the Debtor has almost $1 million less in claims, mostly in priority claims from the petition date until today. Despite the UST's concerns with the professional fees they have benefitted the estate and the creditors because the Debtor's indebtedness has been greatly reduced due to the litigation. Another unusual circumstance is litigation with non-creditor parties. The Debtor argues that they did not enjoy the full protection of the automatic stay because the same was breached and this issue was litigated for a year and a half just to restore the *status quo* to the petition date. After the opinion and order rendered by this court on July 27, 2018[1], the Debtor is in a better position to negotiate since that opinion and order was a game changer. Another unusual circumstance was Hurricanes Irma and Maria which nearly destroyed the economy in Puerto Rico. Notwithstanding, the Debtor maintained operations and at this point in time it is the only luxury hotel open which gives the Debtor a competitive advantage. The high season for the year 2018-2019 is the first high season the hotel

---

[1] The court in its *Opinion and Order* held that ITC violated the automatic stay provisions of 11 U.S.C. §362(a)(4) when it filed the "Instancia" (document) by which it requested the Property Registrar to alter the ranks of the liens an subordinate the Debtor's deed of usufruct (lien) to that of one of the mortgages, meaning that the Debtor's real property rights were altered resulting in its usufruct lien having an inferior rank without requesting relief from the automatic stay from the Bankruptcy Court. ITC did not obtain the Debtor's consent as an affected titleholder pursuant to Article 151 of the prior mortgage law which was the one in effect at the time. The court held that the ministerial act exception does not apply in the instant case. The court concluded that ITC's actions were void and therefore have no effect. Therefore, the actions taken by the Property Registrar are also void. The Court granted the Debtor's *Motion for Civil Contempt for Violation of the Automatic Stay Injunction* against ITC for a willful violation of the automatic stay under 11 U.S.C. §362(a). However, the court held that the Debtor was not entitled to its remedy (for sanctions) as to civil contempt because the Debtor waived the same in the Stipulation with ITC, which this Court approves (Docket No. 466).

-12-

will have in two (2) years. Before hurricanes Irma and María, the high season was affected in the year 2016 due to zika.

As to the UST's position that the Debtor will not be able to pay its priority claims within sixty (60) months, it assumes that the Debtor will pay the same with current operations. The Disclosure statement contemplates two (2) scenarios; namely to repay the same with income from hotel operations and the other scenario was the liquidation or sale of the Debtor's usufruct. Administrative claims other than post-petition taxes require an order from the court. There is no court order authorizing claim number 18 as an administrative claim. The Debtor's position is that it is a general unsecured claim. This is a slip and fall claim in the amount of $350,000 for which there is a $1 million insurance policy. Thus, even if it were an administrative expense of the estate it would not burden or water down distribution to pre-petition creditors. This case is actively been litigated in Aguadilla and the estate has not paid any monies on legal representation because of the insurance policy.

### **Evidentiary Hearing**

*Testimony of Ms. Iliana Payano*

Ms. Iliana Payano stated that she currently works at Midwest Servicing, Inc, the servicer for PRCI loans, LLC. She has worked for Midwest Servicing Inc. for over eight (8) years as a loan officer and a group leader. Her duties include to oversee a group of performing and non-performing loans and develop an execute value maximizing resolution strategies of the assets under management.

Ms. Payano has a bachelor's degree in business administration and an MBA with a concentration in finance and technology management. She has an associate degree in international business. She stated that PRCI loan is the owner/holder of the mortgage in which ITC is the borrower. Ms. Payano testified that the mortgages were secured by real estate property in Rincón. It is commercial property that is being used as a hotel. The hotel is the Horned Dorset.

PRCI did not originate the loan. PRCI acquired the loan from Banco Popular around June 30, 2016. The loan was acquired when it was in default. She further testified that as of today there is approximately an outstanding principal balance in the amount of $7,087,00, plus accrued interest balance in the amount of $2.9 million, plus attorney's fees and other fees, which amount to a total of $10.1 million.

Ms. Payano testified that at the time PRCI bought the loan, Banco Popular had already initiated foreclosure proceedings and a Judgment had been rendered in that action. PRCI's attempts to collect the monies owed from ITC has not been successful. PRCI has not received a single payment from ITC since it bought the loan from Banco Popular in June 2016. As part of their collection efforts, PRCI has sent letters to the debtor, have had meetings to inquire about their financial position and economic standing and asked whether they owed monies to other creditors and whether they had any other assets. She testified that in every meeting and every conversation, ITC has represented that they did not have the economic means to make the payment on the loans and that right now the only asset that they have is the hotel.

Ms. Payano testified that the payoff document for ITC's debt was prepared by Midwest Servicing Inc. as servicer for PRCI, thus the same is kept under PRCI's records that Midwest Servicing keeps. She stated that as of October 5, 2018 the records show that the total amount owed by ITC for the loans is $10,145,580.93 (Exhibit J). Ms. Payano stated that she had the opportunity to visit the hotel property that secured the loans. She took the photographs on October 2017 and some were taken in June 2018. The first picture shows Casa Escondida, which is one of the structures that holds hotel villas. Photo number 1 taken in June 2018 shows the window and the entrance from a common area of Casa Escondida in which there are a couple of villas. The dark areas are filtration issues in this structure and the paint is no longer there. Ms. Payano testified that she is not aware that the filtrations have been repaired. The second picture taken in June 2018 shows the inside of a villa in Casa Escondida which is part of PRCI's collateral. This picture shows that the some of the ceiling's gypsum boards are missing while

-14-

others are damaged by water. The lamps are hanging from the ceiling as well as the vent from the air conditioning unit. Ms. Payano testified that she visited the property after the hurricane in October 2017 and in June of 2018 there was further deterioration from the initial visit in October. She stated that she did not know whether this particular villa is being used to accommodate guests. Photograph number 3 was also taken in June 1018 and is also from the same villa which shows additional gypsum boards missing from the ceiling and lamps hanging from the ceiling. Ms. Payano testified that regarding photograph number 4 also taken in June 2018 and is a picture of the ceiling in which the shower is located that has mold. She stated that she is unaware of whether this damage had been repaired.

Ms. Payano further testified that she took picture number five (5) in October 2017 which is a common area of the hotel next to the structure where the lobby and the restaurant are located. This photo shows that there is a hole on the floor which was a consequence of the hurricane. She stated that she does not recall whether this damage has been fixed. She stated that picture number six (6) was taken in June 2018 and it is a sky wall for the structure that holds the restaurant and the lobby of the hotel. This picture shows that there is water damage due to filtration and the paint is coming off the wall. There is also damage to the column in which one can see the cement. Ms. Payano stated that at the time she visited the column had not been repaired and she does not know if the wall has been painted. She stated that photograph number seven (7) taken around June 2018 shows the same column that was seen in the prior picture. Ms. Payano further stated that photograph number eight (8) was taken in October 2017 and it shows the terrace of an ocean front villa in which the floor is cracked, and the veranda is damaged. Some of the poles (fillers) are broken. The damage is a result of the hurricane. She stated that she believed this villa is owned by ITC. Ms. Payano testified that at the time of her visit, the villa was not being used. She stated that she was not sure about the number for that villa.

Ms. Payano stated that photograph number nine (9) is of a different villa and the same was taken in June 2018 and it shows that the floor is cracked. Ms. Payano stated that at the time

of her visit this villa was not being used. She stated that she was not sure if that particular villa is collateral for ITC. She testified that photograph number ten (10) shows the balcony or the terrace of an ocean front of a different villa in which the floor is cracked. Ms. Payano stated that she does not recall whether she took the picture in June or in October, but for the ocean front villas that she saw, the crack was still there in June. As to photograph number eleven (11), Ms. Payano testified that this is also the balcony or terrace of an ocean front villa which shows a big crack on the floor which is larger than the crack shown in the other pictures. She stated that it might be a picture taken from a different angle of one of the ocean front villas. Ms. Payano testified that at the time of her visit in June 2018, the villa was not being used. She also testified that photograph number twelve (12) was taken in June 2018 and it is a picture of the beach at the hotel and of the structure that holds the veranda or the balcony of the ocean front villas in which a section of the veranda was destroyed and there is some debris hanging from the wall. Ms. Payano testified that at the time of her visit in June 2018, this damage had not been repaired.

Ms. Payano further testified that PRCI has a master insurance policy that it purchased at the time it acquired a group of loans from Banco Popular on or around June 30, 2016 at the time ITC's loan was bought. At this time, it is unclear whether the policy will cover any damages or issue any payment for this property. Ms. Payano stated that PRCI during the las two (2) years has been approached by different parties interested in the property or buying the property. Ms. Payano testified that PRCI has not been able to sell the property or the mortgage loan because the interested parties feel apprehensive regarding the purchase because of the on-going litigation with respect to the status of the lien position of the mortgage note and all the controversy that has been ongoing.

*Cross-examination of Ms. Payano*

Ms. Payano testified that there is a final judgment in the state court litigation between PRCI and ITC for the foreclosure of the mortgage notes. After the foreclosure of the mortgage

notes, there has not been much movement in that case. She stated that PRCI has not deposed ITC.

Ms. Payano stated that she knows the total number of villas that PRCI has as collateral for its loan, but she does not know the total number of villas in the hotel property. She testified that she is unaware of how many units the Horned Dorset had in its room pool before PRCI acquired the loans nor how may villas the Horned Dorset currently operates.

Ms. Payano stated that photograph number one (1) is of a villa at Casa Escondida. She testified that at Casa Escondida there is a villa that may be privately owned, but PRCI has two (2) villas as collateral at Casa Escondida. Ms. Payano testified that she was unable to recollect how many villas in total there are at Casa Escondida. She stated that as to photograph number two (2), she was not sure whether it is villa number 27 or 28. Ms. Payano testified that she does not know whether after her visit there has been any work done on that villa. She testified that her visit lasted a little bit over two (2) hours.

She stated that regarding photograph number eight (8), she does not know the exact villa number said picture corresponds to. As to the owner of this villa, Ms. Payano stated that it would have been ITC because the pictures that she took were for PRCI's collateral. She stated that she does not know the number of the villa. Ms. Payano further testified that the purpose of her visit in June was to assess the damage of PRCI's collateral. She stated that PRCI has ocean front villas #3 and #7, but she cannot state from the photograph which villa it is.

Ms. Payano testified that regarding photograph number nine (9), she does not know the specific villa number. She stated that she believes the owner of the villa would be ITC. Ms. Payano testified that regarding photograph number ten (10), she believes it is villa #7, but she is not sure. She stated that if it is villa #7, then it is collateral for PRCI's loan which would be owned by ITC. Ms. Payano testified that the villas encumbered by PRCI have the following numbers: #3, #7, #27, #28, #19, #23, #24, #25 and #16, and that #3 and #7 are ocean front villas. Villas #27 and #28 are located in Casa Escondida. Ms. Payano further testified that there are no

pictures of villas #19, #23, #24, #25 and #16. She stated that they have an appraisal that they inherited from Banco Popular when they were the holder of the mortgage. She testified that she could not recall the date, but that it was either 2014 or 2015. Ms. Payano stated that the appraisal was for the nine (9) individual villas and it was approximately for $2.5 million. The appraisal that she saw had a market value and a liquidation value. Ms. Payano testified that she cannot recall whether the $2.5 million was the market value or the liquidation value. She stated that in the hotel property, there are other villas that are not PRCI's collateral. Besides the villas, there are other structures within the premises.

Ms. Payano clarified that PRCI has an insurance policy for the loans it acquired from Banco Popular, not for the property. She stated that it is a master policy that it is placed for either real estate owned by PRCI or by collateral that is not real estate owned.

*Testimony of Mr. José Bechara*

Mr. José Bechara testified that he is a construction businessman. He stated that he has been ITC's President since its inception in the year 2005. He owns 50% of ITC's shares. The other shareholder is his brother, Carlos Bechara. He stated that they created ITC for buying and developing the Horned Dorset property. The Bechara brothers worked for many years developing the project, but are not presently engaged in action on the project.

Mr. Bechara testified that the business relationship between ITC and Horned Dorset began when they bought the property from the Horned Dorset, and assumed the debt from Westernbank, and advanced them some monies as part of the deal. ITC started developing and redoing the construction and renewing the 22 units and convert them into 17 units which were for sale at that time. The Horned Dorset managed the hotel rentals privately with the owners who voluntarily agreed to the same. Mr. Bechara testified that the deal took place approximately thirteen (13) years ago when the loan agreement with Westernbank was signed around the year 2005. The amount of the loan with Westernbank for construction and other expenses such as furniture, and there was also an interest amount was in the range of $7 to $8 million. Mr.

Bechara stated that it was a revolving line of credit, as ITC was selling units and repaying the bank. He further testified that the purpose of taking the loan with Westernbank was to rebuild the hotel and turning the 16 units into 17 new, luxurious units; paying half a million dollars to the Horned Dorset Primavera for business interruption; and to acquire some land across the street.

Mr. Bechara testified that when the Horned Dorset sold the property to ITC, the Horned Dorset requested a monetary amount to be paid. The monetary amount was going to be paid pursuant to an arrangement which was divided in different phases. In the first phase, depending on how the sales went, $2 million would be paid. Mr. Bechara testified that ITC did not repay the Horned Dorset the amounts they were owed because they did not sell all the units.

Mr. Bechara testified that the amount of $11.3 million that the Debtor seeks to collect from ITC through the adversary proceeding is outrageous. He stated that they did not even finish the first phase and that the property was not even worth that much money. Mr. Bechara testified that they had an agreement with the Debtor that they were going to pay them with the sales. He stated that to the best of his knowledge, it was $2 to $3 million for the first phase after the $500,000 they paid up front. It was a very long and complex agreement that they had. Mr. Bechara testified that they did the renovations, had some sales and did very well for a while. Then the economy collapsed and the bubble burst. Everything stopped.

Mr. Bechara testified that the purpose of the transaction was for ITC to convert the room hotels which were around 28, 29 or 32 into 17 villas. ITC converted all the room hotels into the 17 villas. ITC sold 7 to 8 units out of 17 units. He stated that to the best of his knowledge, the last sale of a unit was three to four years. Mr. Bechara testified that since the last sale of a unit, ITC has not had any source of income. ITC still owns nine (9) units. Mr. Bechara testified that during the last two (2) years or more, ITC has not generated any income. He further stated that currently, ITC owns the land and the facilities of the Horned Dorset properties and the unsold villas. ITC does not own any more assets or properties of any kind. Mr. Bechara testified that if the Debtor were to prevail in the adversary proceeding, ITC would not have the financial means

to pay the $11 million. He further stated that ITC right now has no source of income right now, thus, ITC cannot pay anything to Debtor. Mr. Bechara further stated that ITC has not received any formal offers to purchase the units. Mr. Bechara stated that he believes the deals have not materialized because the properties need a lot of work and have a big debt. He stated that the property needs major improvements such as the restaurant and the lobby in the main building were very affected. The sea walls are very damaged. The property has suffered a lot and one can see the tear and wear in the pools and in the rooms. ITC used to have an insurance policy many years ago, but since ITC does not have any income there is no insurance policy. Mr. Bechara testified that he does not believe that ITC is responsible for repairing the damages because they are not the ones who manage the property or make any monies from the hotel properties. He stated that he estimates that it would take around $1 to $1.2 million to repair the damages and bring the hotel back to a quality standard, including repairing the sea wall.

Mr. Bechara further stated that after the hurricane, six units owned by ITC are being used by the hotel to accommodate guests. The remaining units are not being used because they have suffered many damages due to the hurricane. Due to damages to the sea wall, some units may not be used. He stated that the debts pursuant to the Property Registry are the loans that are currently held by PRCI. The investors that visit the site know how much the property owes.

Mr. Bechara testified that he is familiar with the deed of usufruct from the year 2005 (Exhibit H). It has his signature. He explained that the terms of this document in general terms were that during the negotiations the Horned Dorset wanted to manage the property, so they proposed the usufruct to manage the hotel subject to certain rules and they had no objection at the time. The document explained how the Horned Dorset would run the hotel and manage the villas and maintain a standard quality. He further stated that as part of that agreement, ITC granted the Debtor the right of usufruct to operate the hotel in addition to $1 million to be discounted from the sales price. Mr. Bechara explained that when he signed the mortgage agreement, Westernbank, which was the bank at the time, through its lawyer made it very clear

-20-

at the time that it was a condition of the bank that the mortgages had the first rank in case the bank had to execute (foreclose) the notes if they were unable to pay.

Mr. Bechara read paragraph eleven (11) of the deed of usufruct which reads as follows:

"[t]he Usufructuary acknowledges that in order to make viable future developments, it will be necessary to mortgage the property object of this usufruct, for which reason by the present it consents for the title owner to establish a mortgage over the same up to the maximum amount of twelve million dollars ($12,000,000) for development, agreeing through the present to consent to the mortgage having preferential rank over its usufruct right, to execute any document or public deed, for example, without that implying a limitation, a special irrevocable power having an interest, subordination, cession, liberation, segregation, accumulation, addition, easement which might be necessary or convenient to make viable the future developments."

The intention was to develop the hotel into private units in different phases and rent the same to the hotel to manage. Mr. Bechara testified that the intention of the parties was that the mortgages be ranked first because in order to sell or to keep building. Mr. Bechara stated that he does not have control of the units because of the stay of the court. The Horned Dorset controls everything. Mr. Bechara testified that his estimate of the value of all the property owned by ITC as is, ranges from $2 to $2.5 million. After the hurricane, the damage makes the units unsuitable. Moreover, there is no water meter for each unit and also there is no electricity meter for each unit. This is an issue for new buyers, in addition to the construction that needs to be done. Mr. Bechara testified that the villas and the whole property after the hurricane is worth somewhere around $2 million. A couple of years ago, the value of the property was $6 million, and many years ago it was much more, as value depends on the time, the economics, and the conditions of the property.

He further stated that he has visited the property very often. Last week or the week before was the last time he visited the property. The $2.5 million property value he estimates is based on the units taking into account what we have there right now. Mr. Bechara testified that he guaranteed the repayment of the PRCI loans in his personal capacity.

*Cross-Examination of Mr. Bechara*

Mr. Bechara explained that ITC purchased the property from the Horned Dorset. ITC signed two notes payable to the Horned Dorset in addition to the bank loans. Each note that he signed on behalf of ITC and payable to the Horned Dorset is for $4 million. Mr. Bechara testified that according to the contracts, ITC owes the Horned Dorset between $2 to $2.5 million. Moreover, ITC was sued by the bank for foreclosure proceedings. Mr. Bechara testified that ITC has not made any profit of the units because it is not able to fix or sell them.

Mr. Bechara explained that he estimated the value of the property to be around $2.5 million based on his construction and development experience. He stated that he is not an appraiser. Mr. Bechara stated that he has fifteen to eighteen years of experience in the construction industry. He stated that he has worked on many construction projects; 500 units; eight to ten projects; many complete works, buildings.

*Testimony of Mr. José A. Cuevas*

Mr. José Antonio Cuevas stated that he currently works for the United States Department of Justice in the U.S. Trustee's program. He stated that he has been employed for almost two years. Mr. Cuevas testified that as part of his job with the UST he works with chapter 11 cases. He stated that his main duties for chapter 11 cases include: perform analytical review; review the feasibility of the Debtor's operating plan; conduct initial debtor interviews; ensure that the debtor files all the monthly operating reports; review the monthly operating reports; monitor the […….] statement and provide testimony as necessary.

Mr. Cuevas testified that he has a juris doctor from the InterAmerican University and from the University of Puerto Rico he has a bachelor's degree in business administration with a concentration in accounting. He stated that in the year 1995 he obtained his certified public accounting license. He was admitted in the year 2005 to the bar of Puerto Rico.

Mr. Cuevas stated that he is familiar with this particular case and that he has reviewed and analyzed all the monthly operating reports that the debtor has filed. He testified that he

prepared the document that is marked as Identification F. This document is a spreadsheet with the Debtor's income and expenses from February 2018 to July 2018. The purpose of this spreadsheet was to analyze the Debtor's last six (6) months of operations. CPA Cuevas testified that the Debtor's financial performance is at an operational loss in the amount of negative ($4,458.65). During the March 2018 MOR, the Debtor had an income of $252,000 because it received a payment in the amount of $200,491 from the insurance company for business interruption, therefore in the month of March there is a positive cash balance of $39,000. Without that big deposit, probably the total loss could be higher.

CPA Cuevas testified that he prepared Identification L which is titled, The Horned Dorset Primavera, Inc. Receipts and Disbursements from May 23, 2015 to August 31, 2018. This document includes all of the Debtor's income and disbursements from the petition date, May 23, 2015 to July 31, 2018, not until August 31, 2018 as included in the document's title. Mr. Cuevas stated that he obtained the numbers from the monthly operating reports filed by the Debtor. As to the Debtor's financial performance, this document shows that the Debtor had a couple of months with a profit. However, for the majority of the months there is an operational loss, and the net cash flow in this worksheet is negative $20,964. Mr. Cuevas testified that he reviewed the August 2018 monthly operating report and the Debtor had a profit of approximately $880. The net operational loss would be reduced by $880, therefore the net operational loss would be approximately $20,084.

Mr. Cuevas stated the he prepared the document titled, The Horned Dorset Primavera Inc. Income and Expenses for the last year (Exhibit M). The analysis that was done was on a one (1) year basis. The first table of the document covers one year from August 2017 to July 2018 in order to include the Hurricane Maria period. The second table of the document is also a one-year analysis that covers from September 2016 to August 2017. The second table does not include the Hurricane Maria period. The Debtor's financial performance from August 2017 to July 2018 shows that the Debtor had operational income in the amount of $1,712. In this period, the big

-23-

payment received from the insurance company in March 2018 is unusual. Without this payment, the income that the Debtor disclosed in those twelve months would be less or it would be at an operational loss. The Debtor's financial performance from September 2016 to August 2017 was an operational loss of $5,460, which did not include the Hurricane Maria period.

CPA Cuevas testified that from the analysis of the monthly operating reports, Debtor's argument that it will recover the losses it sustained in the low season with the profits it will receive in the high season will not hold true. Mr. Cuevas explained that he prepared three (3) spreadsheets. The first one was for a six (6) month period. The second one was for the entire bankruptcy period from 2015 to 2018, inclusive of all seasons of the year and in the last spreadsheet it was two tables for a one-year analysis that also included all seasons of the year. The numbers reflect operational losses. If we take a five (5) year period, the Debtor would have to earn more than $20,000 a month in net income to pay the amount of $1.4 million of priority debts. The Debtor would have to earn more than $70,000 per month in net income to pay the $1.4 million of priority debts over a twenty (20) month period.

Mr. Cuevas further testified that Identification G includes a summary of all the applications for compensation that the Debtor has filed and have been granted. The document discloses that from November 2015 to November 2017, the Debtor has transferred the amount of $276,978 to its attorneys. The last fee application was filed on November 1, 2017.

The Debtor's monthly operating report for August 2018 (Docket No. 504, Exhibit N) shows there is a cumulative balance as to the professional fees (accounting and legal)-line 5K)) is in the amount of $272,011.59; the accounts payable in the amount of $112,575.82 and the new indebtedness incurred this month is in the amount of $21,647.67; and the ending balance is in the amount of $124,273.49.

*Cross-examination of Mr. Cuevas*

Mr. Cuevas stated that according to accounting principles a company can keep records of its transactions using the cash basis or the accrual basis. Mr. Cuevas testified that under the cash

basis, corporations or any other entity records their transactions at the moment that cash is disbursed or received. Under accrual basis, the transactions are recorded when they are made regardless of the cash disbursement.

CPA Cuevas testified that he has been working as an analyst for the Department of Justice for the past two years. He stated that as part of his duties, he reviews the monthly operating reports. Mr. Cuevas stated that the monthly operating reports are prepared pursuant to cash basis accounting. The Debtor is supposed to disclose all cash, including all accounts receivables. All debtors in possession within region 21 are required to report all income, regardless of its source. All debtors in possession within this region, the cash includes the cash remaining from the prior period. The prior period's ending cash balance becomes the initial cash balance for the next period.

Mr. Cuevas testified that in Exhibit F- the income and expenses for the last six months, he did not include as part of income, the ending cash balance from the previous period. He testified that he does not know if including the prior periods ending cash balance would have resulted in a loss. The monthly operating report of February 2018, page 2 (Exhibit A) shows a beginning cash balance of $3,914. The operating revenues for that month are in the amount of $44,717, the total cash available for operations is in the amount of $48,632 and the expenses for that period were approximately $46,000. At the end of the month, there is a positive cash balance. The monthly operating report of March 2018, page 2 (Exhibit A) shows a beginning cash balance of $2,384. The cash receipts for that month are in the amount of $252,733 and the total cash disbursements were approximately $213,000. At the end of the period, the Debtor had a positive cash balance of $41,672. The beginning cash balance for the next period would be $41,672. The monthly operating report of April 2018, page 2 (Exhibit A) shows that the total cash available for operations is in the amount of $95,627 and the total cash disbursements for that period are in the amount of $85,778, resulting in a positive cash balance of $9,849. The monthly operating report of May 2018, page 2 (Exhibit A) shows that there is cash available at

the beginning of the period. The total cash available for operations is in the amount of $59,759 and the total cash disbursements for that period are in the amount of $46,158, resulting in a positive cash balance of $13,601. The monthly operating report of June 2018, page 2 (Exhibit A) shows that there is $13,601 available at the beginning of the period. The total cash available for operations is in the amount of $54,208 and the total cash disbursements for that period are in the amount of $51,587 resulting in a positive cash balance of $2,621.

CPA Cuevas testified that, thus far, the Debtor has not had any cash deficiencies from the periods reviewed. The monthly operating report of July 2018, page 2 (Exhibit A) shows that the total cash available for operations is in the amount of $68,709 and the total cash disbursements for that period are in the amount of $69,169 resulting in a negative cash balance of ($460). The monthly operating report of August 2018, page 2 (Exhibit N) shows that the Debtor did not have any cash available at the beginning of the month. The Debtor's cash inflows for that period were in the amount of $69,036 and the total cash disbursements for that period are in the amount of $68,146 resulting in a positive cash balance of $430.

Mr. Cuevas stated that Exhibit F took into account the cash at the beginning of the period. The income disclosed for the month of February 2018 in Exhibit N matches the total receipts reported by the Debtor in line item 3 of the monthly operating report. The expenses disclosed for the month of February 2018 in Exhibit N matches the total cash disbursements reported by the Debtor in line item 6 of the monthly operating reports. The income figures in Exhibit F for the months of February through July 2018 match the line item of total receipts in the operating reports and the expense figures in Exhibit F match the line item of total cash disbursements in the operating reports. However, these figures do not account for the total cash available for the period.

Mr. Cuevas further stated that in the August 2018 monthly operating report (Exhibit N), the cumulative petition to date as to the line item of cash at the beginning of the period shows a

positive cash balance. CPA Cuevas agreed that if a debt is not matured, then it does not have to be paid.

He is aware that after Hurricane Maria, the utility services were billed incorrectly, but was not aware that the legislature from Puerto Rico passed a law (Act no. 143 of the year 2018) providing a procedure for bills after hurricane Maria.

Mr. Cuevas testified that he is familiar with the instructions for the preparation of debtor's monthly operating reports for business (Exhibit 1- instructions). He stated that the Debtor did not use the small business form. Mr. Cuevas stated that he is familiar with the document titled, operating guidelines and reporting requirements for debtors in possession and chapter 11 trustees revised version of January 7, 2018 (Exhibit 1- guidelines). The instructions include all cash receivables, cash receipts including insurance proceeds.

CPA Cuevas has worked in accounting for several years including clients that were individuals and corporations. He stated that the purpose of the business interruption policy is to recoup its lost income due to a natural disaster. If a debtor received income from the business interruption policy, the same would have to reported as a cash inflow in the monthly operating report.

*Re-direct of Mr. Cuevas*

Mr. Cuevas testified that he did not include the beginning and ending cash balances in the summary tables that he prepared. He used total receipts and total disbursements. He stated that if he would have taken into account the ending cash balance in the August 2018 operating report which was in the amount of $430, that would not have changed his conclusion that the Debtor will be unable to pay its $1.4 million priority debt. He stated that from his analysis of the operating reports, the Debtor is up to date in paying some of the post-petition accounts payables. Mr. Cuevas stated that the post-petition accounts payable for the August 2018 monthly operating report indicates that $124,000 is owed for post-petition payables (Exhibit N). He testified that if

one subtracted the amount of $124,273 owed in post-petition accounts payables from the ending cash balance of $430, it would result in a negative cash balance.

The post-petition accounts payable for the vendor AEE in the monthly operating report is for the following months: January 21, 2018; February 28, 2018; March 31, 2018; April 30, 2018; May 31, 2018; June 30, 2018; July 31, 2018 and August 31, 2018. The debts the Debtor has with AEE amount to approximately $70,000, and is subtracted, the post-petition accounts payable balance would be approximately $54,000. In addition, if the debts with AAA, which amount to $40,000 are subtracted, then the balance for the post-petition accounts payable would be in the amount of approximately $14,000. Moreover, if the ending cash balance of August 2018 were subtracted from the remaining post-petition balance, it would result in a negative cash balance.

Mr. Cuevas further stated that the numbers of the cash at the beginning of the period in the cumulative petition to date column in the August 2018 operating report are wrong because the numbers do not match with the account reconciliation. He prepared a spreadsheet with all the Debtor's monthly operating reports filed (Exhibit L) which resulted in a negative cash flow of approximately $21,000 of operational loss. In the August 2018 monthly operating report, under the cumulative petition to date column, if the cash at beginning of period is $4,725 and it is correct, and there is almost $21,000 of negative cash flow, then in line number 7 ending cash balance, the Debtor is supposed to have about a negative $16,000 balance. CPA Cuevas stated that something is wrong with these numbers.

CPA Cuevas testified that the question asked by counsel as to whether the debts of the power company have matured depends on the type of debt and what are the conditions of the parties. There is no black and white answer. CPA Cuevas testified that the insurance proceeds received by the Debtor of approximately $211,000 and disclosed in the March 2018 operating report is only because of Hurricane Maria. This type of deposit was not repeated in any of the other monthly operating reports.

CPA Cuevas testified that the total income received by the Debtor during the period from August 2017 to July 2018 was in the amount of $728,092 and for the period from September 2016 to August 2017, the total income received was in the amount of $913,378.84 (Exhibit M). He stated that the first number includes the insurance proceeds for business interruption, but in the period of September 2016 to August 2017, there was no deposit for business interruption.

*Re-cross of Mr. Cuevas*

Mr. Cuevas testified that the insurance proceeds for business interruption only occurs when the business is interrupted. He stated that the insurance proceeds will not be a recurring income because he presumes that the business will not be interrupted.

*Testimony of Mr. Wilhelm Sack*

Mr. Wilhelm Sack stated that he works as the general manager of the Horned Dorset Primavera Hotel in Rincón. He testified that he has worked at the Horned Dorset for twenty-two years. Before working at the Horned Dorset Hotel, he worked for twenty years in Bermuda. For the first five years he worked as an assistant manager and for 15 years he worked as a general manager of the Horizons and Cottages, a high-end family resort that has fifty units.

Mr. Sack testified that the Horned Dorset is a small high-end luxury resort in the outskirts of Puerto Rico. He identified a plan of the villa suites of the Horned Dorset. The Hotel does not own the property, the hotel operates under an usufruct that they received when the hotel was sold to the developer Inmobiliaria (ITC).

Mr. Sack further testified that under the Usufruct Deed it is the right of the Horned Dorset Primavera Inc. to manage the hotel property which was acquired for thirty (30) years when the hotel property was sold. He read the Third paragraph of the Deed of Usufruct which reads in the following manner:

> "It is the desire of the appearing parties that The Usufructuary may continue to operate the hotel and restaurant business at the real property which is the object of this public deed. As such, and considering that The Usufructuary credits to the Sole Legal Title Owner the amount of One Million Dollars ($1,000,000.00) to the sale and purchase price, The Sole Legal Title Owner, by this act confers on The Usufructuary, an usufruct for the

exclusive use of a hotel and restaurant business which is at the level of the standards of quality and image which have to date been developed by the Usufructuary, over the main administration building wherein the reception and the restaurants are located, the structures which house the reception and the restaurants are located, the structures which house the reception for the villas and the administrative offices, the laundry, the gymnasium, the access paths, the swimming pools and the gardens, as well as the easements which the parcel object of the present public deed, in its characters as dominant tenement, has over the adjoining parcel wherein the hotel villas are located, in terms of access to the gardens and swimming pools and the maritime zone" (Exhibit H-Usufruct Deed).

Mr. Sack explained that the Horned Dorset's usufruct is over the reception building, the restaurant, the laundry, the gymnasium, the access paths, the swimming pools, the gardens, the easements. He testified that at the time of the filing of the petition, the Horned Dorset had fourteen (14) villas which are owned by Inmobiliaria (ITC). At the time of the filing, the debtor operated all villas, with the exception of room numbers: 10, 36, and 29. That is, they were operating fourteen (14) out of seventeen (17) villas. At the time of the filing in the year 2015, the business was good, but after the filing of the petition in the year 2015, the business was not as good as before. In the year 2016, the business started going back due to the recession that was going on in the United States. In the year 2017, the hurricane happened and the whole island was affected. Many hotels in Puerto Rico did not reopen.

Mr. Sack testified that before the hurricane, the villas that were operating were the following numbers: 1, 3, 5, 14, 7, 9, 27, 28, 19, 15, 16, 25, 24, 33, 34, and 35. Property numbers: 16, 23, 24, 25 and 19 are owned by ITC. None of the villas are owned by the hotel.

Mr. Sack testified that Casa Escondida is a four-suite luxurious building which has four units. Numbers 10 & 7 are ocean front and numbers 26 and 29 are on the side which are two, two (2) bedroom suites. All of the units from number 29 to number 1 are ocean front.

Mr. Wilhelm Sack stated that the pictures that Ms. Payano testified about included pictures of the villas in Casa Escondida taken shortly after the hurricane. Since that picture was taken, there has been progress which continues in Casa Escondida. Mr. Sack testified that the difference in these pictures and the ones he took in October 10, 2018 is that the more recent show Casa Escondida has been cleaned and painted. There has been on-going process. They are repairing the villas because they want to rent villas #s 27 and 28 by Thanksgiving 2018 and the other two units he wants to have them ready by Christmas 2018. These are ocean front villas which generate up to 25% to 30% of the total monthly income. Mr. Sack testified that they were fully booked from December 29, 2018 to January 5, 2019 in which NBC Television is staying over and paying full rate. Mr. Sack explained that right now fully booked means that they have all of the 8 villas booked. He testified that if they are able to fix the four villas at Casa Escondida, they will be able to increase their income by 25% to 30%.

Mr. Sack testified that Ms. Payano's second picture is of suite #28 at Casa Escondida which was taken after the hurricane and after we started working on it. He stated that he has pictures of the villa after they started working on it. The ceiling did not fall down, it is under repair because it is cut straight given that it's the way that you replace the gypsum board. He explained that after the hurricane there was a lot of damage and they hired a company to replace the gypsum board which had to be cut in squares and replaced it correctly. He stated that he would agree with Ms. Payano that the damage was hurricane related because it is water damage. Mr. Sack explained that they took the ceiling down to replace it with new gypsum board. It is currently being replaced.

The third picture of Ms. Payano is basically the same picture as picture #2. It is the same room at Casa Escondida, villa #28. The fourth picture of Ms. Payano is the shower of unit #27 at

Casa Escondida which has mildew at the corner. This is part of the gypsum board project. The fifth picture of Ms. Payano shows the secondary entrance to the beach which does not exist anymore because it was damaged by the hurricane and it is being sealed off completely so that nobody can go through here. Mr. Sack explained that the main entrance to the beach is what is in front of the villas which they recently installed new wooden steps. He stated that the wooden steps were installed three or four weeks ago.

Mr. Sack testified that the secondary entrance which has been sealed off, does not have a beach right now. There is water, but no sand. He stated that the access to the beach is part of the usufruct, but the beaches in Puerto Rico are public.

He stated that the picture taken by Ms. Payano shows the side of the back area and above is the dinning room. It was damaged by the hurricane and the debtor is working to have it ready by Thanksgiving. It has not been painted because we want to wait until this year's Hurricane season is over as they need to be very careful how to spend resources. Mr. Sack testified that the restaurant is in use.

Mr. Sack testified that Mr. Payano's pictures 8, 9 and 10 are residences. During the past year, the hotel has not been using villas due to safety concerns. These villas do not generate income.

He further testified that after the hurricane, the debtor had no electricity and no telecommunications from September 20 until mid-February, and even after February there were issues with the electricity and had to use a generator to make some money. The hotel was completely closed for the months of October and November. There was a soft opening at the end of December and there were also soft openings during the months of January and February. Mr. Sack testified that they didn't get electricity bills for months and months until approximately

-32-

March. The bill was approximately for six months and the same was objected. The objection process is still going on. Mr. Sack objected the electricity bills during the months in which they had no service which were: September, October, November, December, January and in late February we had electricity.

Mr. Sack testified that AAA is the Puerto Rico water and sewage authority. They were billed after the hurricane by AAA for their water usage. He explained that they paid for some of their water bills and have a payment plan, for the balance owed, in which they are completely up to date with. The payment plan with AAA is dated July 17, 2018. According to the payment plan, the first payment in the amount of $6,000 was due on July 17, 2018, the day it was signed, and it was paid. A week later we paid another $6,000 and the first installment payment was paid in September. The next installment is due in October. Mr. Sack testified that they are in compliance with the payment plan.

Mr. Sack testified that right now they are operating 8 villas. They expect to be operating four (4) more villas by the end of this year. Thus, there will only be a difference of 2 villas from the petition date. He stated that the hotel right now looks respectable and usable. He further stated that they have started some time ago a reorganization of their reservation system and 50% of the hotel revenues is from online bookings and has generated this year alone over $200,000 and it is up 83% compared to last year. He stated that despite the hurricane, this year's reservation is amazing when compared to the prior year. This year's summer occupancy was the highest we have ever had before but we also had online bookings.

*Cross-examination of Mr. Sack*

Mr. Sack testified that he could not answer with a yes or no whether in the prior hearing he had stated that when the Debtor filed for bankruptcy business was good. He stated that they

-33-

were working. Mr. Sack explained that the hotel filed for bankruptcy because they had been affected for a couple of years by the zika virus and then they used to manage for ten (10) years the villas by the Horned Dorset, thus there was a decrease in revenue. Mr. Sack stated that he does not know exactly whether the effect of the zika was after the filing of the bankruptcy petition. He stated that the Debtor had accumulated debts for the room taxes. He testified that the Puerto Rico Tourism Industry initiated a proceeding against the Debtor to collect the room tax debt. Mr. Sack testified that the room tax collection proceedings could be part of the reason for the bankruptcy filing.

Mr. Sack testified that a few years before the filing of the case, the hotel operated some villas in an adjacent property as a condo hotel. The villas are still called the Villas at the Horned Dorset. They had an agreement with the condo villa hotel for ten (10) years and after they lapsed, both sides dropped the agreement. The ten years expired approximately in the year 2012. The Horned Dorset originally consisted of 33 units and with the villas it had 22 more units which were smaller rooms.

Mr. Sack testified that on August 1, 2005, they entered into an agreement with a local developer to convert the 33 existing units into 17 big suite units. He stated that in the year 2013, if we still had the agreement it would have been 55 units. At the time of the bankruptcy petition, the hotel had the right to operate 14 units. During the year 2015 to the date of hurricane Maria in the year 2017, the hotel operated 14 units. Mr. Sack testified that after the hurricane, the hotel has been operating 8 units. He explained that they have only been operating 8 units due to the damage caused by hurricane Maria. There was minimal damage in the back of the property, but the ocean front property was destroyed. He stated that by Thanksgiving 2018, there will be two more ocean front units available at Casa Escondida, #27 and #28. By the end of the year, he

hopes to have two more units at Casa Escondida, #26 and #29. Mr. Sack testified that by the end of this year, they will have at most 12 units.

Mr. Sack testified that the Horned Dorset does not own any villas. However, they have been repairing the villas that are in the room pool so that they can accommodate guests in the future. He further testified that the privately-owned villas would have to be fixed. Also, the sea wall on the other side that is owned by the villa owners would have to be fixed. It still has some work to be done. Mr. Sack testified that he really does not know how much money the hotel expects to pay to finish the repairs.

Mr. Sack stated that the electricity bill dated February 14, 2018 that covers the period September 1, 2017 through February 2, 2018 is in the amount of $24,429.08. The invoice discloses a previous balance in the amount of $27,446.14. He stated that he objected this bill because the hotel should not be charged this much for using only 8 villas. Mr. Sack testified that they use the same meter for all the units in the property. Besides the villas, the bar, the restaurant, the laundry, the common grounds use electricity. However, there has always been one meter.

Mr. Sack testified that the first interest in real property that is listed in the schedules is the right to acquire land remnant over property located at Rincón as listed in Schedule A (Exhibit B-Schedule A). Mr. Sack testified that he did not recall the figures in Schedule A. However, he recalled the $1 million for sure. He stated that he cannot answer what the right to acquire the land remnant is and that he does not recall how the right to acquire the land remnant was valued.

He stated that he expected the gross income to increase based on the bookings for the winter season. Mr. Sack further testified that when the income increases, some expenses will increase as well. If there are more guests, more electricity will be paid, more employees will be paid, and also more room taxes will be paid. Mr. Sack testified that he received from the Debtor

a monthly salary of $4,000 "something." He does not receive any other benefit from the hotel. The hotel is not up to date paying his salary. He testified that he does not how much the hotel owes him in terms of salary. Mr. Sack testified that the restaurant of the hotel is operating fully, but the Horned Dorset Primavera is giving the restaurant to somebody else to run, called Chateaux Rose, an outside company. They pay a fee and we charge it over a period of time. Before the hurricane they used to charge $3,000, but since the hurricane they have not charged the fee because there were no guests. However, it expects to receive the fee during the high season.

*Re-direct of Mr. Sack*

Mr. Sack explained that wherever the sea wall sits on solid rock when it was built more than one hundred years ago it did not sink after the hurricane and where it sat under gravel and sand it sunk (Exhibit K). He stated that none of the villas owned by the hotel or are under the usufruct were affected by the damage to the sea wall.

Mr. Sack testified that the check register in the September 2018 monthly operating report are for checks in which account number ending 4380 is used (Exhibit P). He stated that he paid the water and electricity bills with certified checks that do not appear in the check register. He stated that certified check dated October 16, 2018 was purchased by the Horned Dorset Primavera (Exhibit VI). He testified that the Debtor pays the UST with certified checks. He testified that the manager's checks are not included in that list.

He further stated that the Horned Dorset is owned by the Pequeños Grandes Hoteles, a company created by the law of Puerto Rico and by its shareholders. He stated that he is a shareholder and the general manager of the hotel. He further stated that he has not been paid his full salary as a manager. The board of directors of Pequeños Grandes Hoteles decided to file for

-36-

bankruptcy. Once the petition was filed we had to follow certain procedures and regulations, such as opening certain bank accounts and other details he does not remember.

*Re-cross of Mr. Sack*

Mr. Sack testified that he issued a check to PREPA in the amount of $5,000 nine (9) days ago, that is on October 16, 2018. He thinks that the $5,000 the hotel recently paid to PREPA is included in the total amount of $30,000 that the Debtor has paid to PREPA since March 2018. The remainder amount of the $30,000 were also paid with certified checks. He stated that the certified checks that are purchased from a financial institution are not reflected in the check register of the monthly operating report. He testified that the monthly operating reports reflect the checks that are issued in the hotel. Mr. Sack stated that the certified checks are deducted from the bank account.

Mr. Sack stated that the payment installment for the PRASA bill in September 2018 was paid with a certified check. The funds for the certified check would be from the operating or the tax account. Mr. Sack stated that he could not find the source of the certified check from the operating report of September 2018. The payment plan is for $4,866 and the utilities expense disclosed on page 2 of the operating report is $5,166. He stated that he agrees that on average the power bill alone is $8,000.

*Testimony of CPA Pedro Juan Rivera Concepción*

Mr. Pedro Juan Rivera stated that he has been a certified public accountant since 1984 (Exhibit VII), license number 1739. He studied accounting and finance in the Catholic University of Puerto Rico.

CPA Rivera stated that he knows the Debtor since May 2015 and is the Debtor's accountant. He does the bookkeeping on a monthly basis of the Debtor's operations and prepares

the monthly operating reports based on the guidelines and instructions. The monthly operating report is composed of various parts, such as the movement of cash, and the other parts relate to balance sheet accounts and some exhibits that support what the guidelines require.

Mr. Rivera explained that bookkeeping entails to record all financial transactions that have been processed through a particular period of time. He stated that the Debtor has a regular bank account and a payroll bank account. He explained that the monthly operating reports are comprised of two parts. One of the parts is based on a cash basis. Cash receipts start from the beginning balance available at the moment that the Debtor filed its petition and then it has the receipts of all sources and disbursements.

CPA Rivera testified that the monthly operating report in a way provides a full picture of the Debtor's financial situation. He stated that Exhibit M is a summary of the cash receipts and disbursements from September 2016 to July 2018 prepared by the U.S. Trustee. Mr. Rivera stated that he has been preparing the monthly operating reports since May 2015 to the present. During the month of July 2018 there was a cash deficiency of approximately $300, the only month in which there was an overdraft or a shortage. The summary in the monthly report takes into account strictly receipts and disbursements, but it does not take into consideration the available cash balance that is important for the reporting (Exhibit M).

Mr. Rivera testified that the methodology he used to project the most probable scenario from the months from October 2018 to March 2019 was that he averaged the total receipts and the total disbursements for that period. Average cash receipts of $54,718 and average disbursements $56,209 with an occupancy rate of 55%, which correspond with the actual results for six months (Exhibit IX).

-38-

He stated that he did an inventory of the units available. The history shows that prior to the hurricane, the Debtor had 14 units available and after the hurricane starting in December, it has had 8 units available. Residences that have ocean view have different rates than the garden view rates. Summer season starts April 2 ends December 20 and from December 21 through January 6 is the Christmas season and thereafter from January 7 until April 1 it is called the winter season. In the projections, the rates used for the months of October and November are the summer rates which are the lowest. If the Debtor rents 100% of the units during the month of October, their revenue would be $110,643. If it rents 50% of the units to be conservative, its revenue would be $55,323. The projections for the month of November, if the Debtor rents 55% of the units based on past experience at the summer rates, would produce a revenue of $59,549. One way we use to validate the future is using past history. This same exercise was done for every single month, for every single day on every single unit that is available. CPA Rivera testified that the occupancy rates published by the Puerto Rico Tourism Company are much higher than the ones they used to prepare the budget in conjunction with the management, in order to be in a conservative and realistic position. The average in the year 2017 in the Porta Caribe[2] region for those months is over 85% and in the current year for the first three months are over 87%.

Historically, the occupancy rate for the winter season dropped and we used 65% which is the most likely occupancy rate that the entity will get. After the month of January, February, and

---

[2] The court notes that the Porta Caribe tourism region is in the south of Puerto Rico and does not include Rincón. The tourism region that includes the municipality of Rincón is Porta del Sol which is the west region. The occupancy rates for the Porta del Sol (west region) for the category of alternative lodging & Bed and Breakfast were the following: January 2019: 48.79%; February 2019: 59.08% and March 2019: 54.48%. The occupancy rates for Porta Caribe (south region) for the category of alternative lodging & Bed and Breakfast were the following: January 2019: 36.89%; February 2019: 45.03% and March 2019: 55.81%.

March high season average. CPA Rivera testified that there are two main variables that affect income which are pricing and volume; the occupancy ratio and the availability of three high prized additional units. The three units alone will add to the contribution margin $39,000 in one particular month. As to the disbursement side, if there is a 55% occupancy rate it would average $56,209. In February, it has a 65% occupancy ratio which is higher and there is an 18% increase in costs across all the accounts. According to his projections, the three additional units will contribute approximately $158,000 in excess cash. This is a cyclical business from April 2-December 20, Christmas peak and then winter which is then, the second high season.

Mr. Rivera opined that the occupancy ratio is conservative and will definitely prove that the entity has a going concern based on the numbers. He stated that the costs can be increased by 20% more or $80,000 and it will have $78,000 in excess cash. CPA Rivera testified that these projections were not prepared in accordance with the established principles, thus there is no opinion, report, or stamp. However, these projections are close to the hotel's reality as to the available units and occupancy rates.

CPA Rivera stated that in the monthly operating report, the receipts include all receipts from all sources, in the amount of $58,000. The majority of these deposits are for November and December. The deposits for the months of January, February and March for the high season are not yet deposited. He stated that he did not subtract from the excess cash that should be available by the end of the month of March, the deposits that have been already been deposited in the bank account, which according to information provided by management add to $58,000 because then he would have to add for every single month what he would expect to receive as deposits for future months. The worst case scenario is that no one else will make a deposit going forward, subtract the $58,000.

CPA Rivera that hurricane Maria affected the receipts and the expenses. In the last 41 months, three events affected the hotel operations. The first one was when the principal officers were in the press because they were taking money from tourism. The second event was zika, but now Puerto Rico is finally zika free. Lastly, the disaster of the hurricane, even though, the entity has adequate insurance coverage, on personal property of $100,000 and $200,000 for business interruption.

CPA Rivera testified that the hotel's management has a very lean operation, meaning that they operate with the minimum amount of resources and provide the best service. He stated that he expects the expenses for the year 2019 should follow the ones he projected which is the average cost on every line, except for the utilities. He stated that he followed the presumption that the Debtor's objection with PREPA will not be granted.

Mr. Rivera testified that he has reviewed all the claims against the Debtor. He stated that claim #18 is a lawsuit against the hotel based upon a person that in the year 2016 fell down and the insurance company is taking care of the case. CPA Rivera testified that since he was appointed as the accountant of the Debtor, he has not seen any expense related to claim 18. He stated that claim #18 will not have an economic impact on the Debtor because the insurance coverage for the commercial general liability clause was for $2 million as of that particular period and the claim is around $350,000 which should be covered by the insurance policy.

*Cross-examination of CPA Rivera*

CPA Rivera testified that for the projections he took into account the recent historical performance of the Debtor, meaning the last five (5) months. He also took into consideration the statistics from the Puerto Rico Tourism Company and the actual rates per season that the entity charges and the management's experience for the occupancy rate for every single month from

October through March. He stated that for the element of management experience it consisted mainly in verbal discussion with the hotel's management. CPA Rivera stated that he reviewed the hotel ledger and invoices on a monthly basis.

CPA Rivera stated that before hurricane Maria, the rates of the hotel were higher than what they are now. He further stated that before hurricane Maria there were 14 villas and now there are 8 and on December 1, there will be 11. Mr. Rivera testified that in his projections, he did not take into account the cost of repairing the sea wall because that is not part of the hotel's responsibility.

Mr. Rivera testified that he does not have the answer at this specific moment as to whether there are any pending payments as to the summary of professional fee applications that have been filed (Exhibit G). He testified that he did not take into account for his projections any pending professional fees (Exhibit G). He testified that the last application for compensation for professional fees was his and it was filed on November 2017 and since that time no fee applications have been granted by the court. CPA Rivera testified that he would have to make the computation to answer the question regarding how much does he estimate is pending in fee applications from the last date the professionals in this case last filed their fee application until today. He does not know how much the professionals will bill from the last date they submitted their application. CPA Rivera testified that he did not take pending professional fees in his projections. He further stated that he is aware that in this case the court lifted the stay, so that PRCI could litigate in state court the priority of its liens over the usufruct lien of the Debtor. He stated that he did not take into account for his projections, the costs the Debtor would incur in litigating this claim in state court. He testified that he did not consider for his projections whether the state court ruled that PRCI's lien had priority over the usufruct lien because it is speculative.

CPA Rivera stated the majority of the post-petition accounts payable are from the power authority and the water authority. He testified that choice cable is being objected (Exhibit P). He explained that he took into account the PREPA objection by adding $20,000 to the projections to cover the same. He testified that he thinks that the PREPA objection was done verbally and that a memo was filed but that there are no official documents. CPA Rivera clarified that when the debtor pays an expense with a certified check the same must be reflected in the operating report because they come out of the bank account. Moreover, the bank statements that disclose all transactions must be included with the operating reports.

There was an installment to be paid to the water authority on September 17, 2018 and according to Mr. Sack it was paid with a certified check. Mr. Rivera testified that he would have to check the evidence as to the certified check. CPA Rivera stated that he did not have the answer as to where in the operating report the purchase of a certified check would be disclosed.

Mr. Rivera testified that his name appears on the September check register because the Debtor was paying him as part of a payment plan for his accounting fees for the pending fee application. He stated that he does not recall when the last fee application was filed. He stated he would have to take a look at the aging and the relation between all approved invoices and payments. CPA Rivera's most recent application for compensation was filed on March 20, 2018 (Docket No. 458) for the period of June 9, 2017 to March 19, 2018. The same was withdrawn on March 22, 2018 (Docket No. 459). CPA Rivera testified that he was not aware that the application had been withdrawn. Mr. Rivera stated that based on the UST Trustee's position he has been collecting fees from the Debtor which were not approved by the court. However, he does not have the records to debate the contrary. CPA Rivera testified that he does not have an idea how much money is owed to him in professional fees.

-43-

CPA Rivera testified that in his projections, the line item net change is the difference between cash receipts and cash disbursements. Net change is not the same as net income because the cash receipts are mixed with the deposits. Mr. Rivera explained that for his projections he only used the last five monthly operating reports because those are the most recent that adjust to the most recent reality of the business. Mr. Rivera projected that for the months of December, January and February the Debtor will have excess cash receipts in the amounts of $36,000 for December; $34,000 for January; and $32,000 and for February. He stated that the biggest contribution will be the three additional units which were not available during the previous five months.

He stated that he began working with the Debtor in May 2015. Mr. Rivera testified that he obtained certain documentation as to Debtor's financial affairs prior to the bankruptcy from the Debtor from its prior external auditor. CPA Rivera testified that the net income for the year ended April 30, 2012 was in the amount of $32,693 and the net increase in cash was in the amount of $13,614 (Exhibit B, pgs. 21-22). Mr. Rivera testified that the net loss for the year ended April 30, 2013 was in the amount of ($134,758) and the net decrease in cash was in the amount of ($13,960) (Exhibit B, pgs. 35-36). Mr. Rivera testified that the net income for the year ended April 30, 2014 was in the amount of $30,383 and the net change in cash was $0 (Exhibit B, pgs. 50-51). These financial statements reflect that prior to the Debtor filing for bankruptcy the highest net income for the years 2012, 2013 and 2014 that the Debtor has was approximately $30,000 and the net change in cash was even less. CPA Rivera testified that he did not take into account these financial statements when he prepared the projections. Mr. Rivera stated that he was aware that during these fiscal years the hotel was operating more units in the hotel and during these years there was no chikungunya epidemic, no zika epidemic and no hurricane

Maria. Mr. Rivera stated that for the period ended April 30, 2014, the total current assets of the Debtor was in the amount of $560,367 and the total current liabilities were in the amount of $2,363,513 (Exhibit B, pg. 48).

CPA Rivera testified that he reviewed the Debtor's disclosure statement (Exhibit I). He stated that he had prepared the projected cash flows around February 2016 that were included in the Debtor's disclosure statement. He explained that these projections were prepared in a different manner from the recent projections because they used the accrual method of accounting. During the first year of the projected cash flows, the total cash receipts projected are in the amount of $1,061,010 and the total operating expenses are in the amount of $749,488 resulting in a projected net cash flow of approximately $311,000 for the first year after plan confirmation (Exhibit I). CPA Rivera testified that the Debtor did not achieve these projections.

The second row of Exhibit M is a summary of the Debtor's income and expenses as taken from the operating reports for the period of September 2016 to August 2017. Mr. Rivera stated that the period of September 2016 to August 2017 covers the Debtor's high season. He testified that these numbers were the ones that were posted in the operating reports which he prepared. This period of time was after the projections that he had prepared in the Debtor's disclosure statement. CPA Rivera stated that in accordance with this page as presented the cash deficit for the period of September 2016 to August 2017 was in the amount of ($5,460.46) which is way less than the original projections which was approximately $300,000.

CPA Rivera testified that he prepared the liquidation analysis that was included in the Debtor's Disclosure statement. In general terms, the liquidation analysis reflects the value of the assets at liquidation value which would be in the amount of $972,916 that would be available for payment to creditors. The liquidation value of the promissory note from ITC is $0 and the right

to acquire the land remnant has a liquidation value of $500,000 and the right of usufruct has a liquidation value of $180,000 (Exhibit I).

CPA Rivera testified that he is not charging the Debtor to appear in court to testify. He stated that he will charge the Debtor for the time he spent preparing the projections at $90 per hour.

*Re-direct of CPA Rivera*

Mr. Rivera stated that he has been living in the Mayaguez area for 38 years. In those 38 years, no hurricanes have occurred in the months of January, February, March, November and December. He testified that he does not foresee a hurricane to occur in the near future.

CPA Rivera testified that he has been an expert in other cases. Some of these cases are in state court. Some of these cases in state court have been litigated for twenty years. He stated that he is aware that the usufruct's rank is being contested by the mortgage creditor that claims that its mortgages should have a superior rank than the Debtor's usufruct lien. Mr. Rivera stated that if the complaint is filed today against the Debtor in state court, it will have no effect in the short term, meaning 6 months to a year.

CPA Rivera explained that in his current projection he took into account that the $138,000 in accounts payable had to be paid. Mr. Rivera explained that he took the most recent months as a basis for his projections because these were the more likely expenses that will be continued to be incurred. He did not use the numbers from the year 2017 because there was a significant interruption. He stated that he did not use the months of January, February, March and April because he did not want his analysis to include the insurance payment.

Mr. Rivera stated that when he prepared the projected cash flows for the five-year period included in the disclosure statement all the units were operating at that moment and the related

-46-

expenses that were supposed to be incurred during that period (Exhibit I). He testified that when he prepared the projections for the cash flow statement that were included in the disclosure statement, he did not take into consideration a zika epidemic or the effects of a hurricane.

*Re-cross of CPA Rivera*

Mr. Rivera testified that this is a letter from his office dated May 16, 2016 and the same is signed by him. The letter is in response to objections numbers 5, 7 and 10 regarding the disclosure statement (Exhibit Q). He testified that the letter explains the reasons the projections were not in accordance with the plan and one of them is the negative effects of the zika epidemic in Puerto Rico. CPA Rivera explained that he did not take into consideration the zika effect when he prepared the projections.

CPA Rivera testified that he does not think that the Debtor will not be able to pay $1.4 million in priority claims by May 2020.

**Applicable Law and Analysis**

Section 1112(b) of the Bankruptcy Code mandates the bankruptcy court, after notice and a hearing, convert or dismiss a chapter 11 case, if the movant establishes one of the enumerated bases for cause by a preponderance of the evidence pursuant to section 1112(b)(4) and the case is devoid of unusual circumstances pursuant to 11 U.S.C. §1112(b)(2). Section 1112(b)(1) and (2) provide, in pertinent part:

(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

-47-

(2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that –

    (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

    (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph 4(A)—

        (i) for which there exists a reasonable justification for the act or omission; and

        (ii) that will be cured within a reasonable period of time fixed by the court." 11 U.S.C. §1112(b)(1) and (b)(2).

Section 1112(b)(1) "invokes a two-step analysis, first to determine whether 'cause exists either to dismiss or convert the chapter 11 proceeding to a chapter 7 proceeding, and second to determine which option is in the best interest of creditors and the estate.'" In re Costa Bonita Beach Resort, Inc., 513 B.R. 184, 200 (Bankr. D.P.R. 2014) (quoting Rolex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.), 14 F. 3d 240, 242 (4th Cir. 1994), and citing In re Mech. Maint., Inc., 128 B.R. 382, 386 (E.D. Pa. 1991)); see also In re Hoover, 828 F. 3d at 8 (similarly describing a two-step inquiry); Francis v. Harrington (In re Francis), 2019 Bankr. Lexis 826, *10 (B.A.P. 1st Cir. 2019). Once "cause" is established, a court is required to consider whether to dismiss or convert the case considering the best interest of creditors and the estate. "[T]he inquiry for [the second] element cannot be completed without comparing the creditors' interests in bankruptcy with those they would have under state law." In re Cont'l Holdings, Inc., 170 B.R. 919, 927 (Bankr. N.D. Ohio 1994) (quoting In re Superior Siding & Window, Inc., 14 F. 3d at 243).

-48-

The initial burden is on the movant to argue and present evidence by a preponderance of the evidence standard to prove its position that there is case for either conversion or dismissal of the Chapter 11 case, whichever is in the best interests of creditors and the estate. See Alan N. Resnik & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2019). "Thus, until the movant carries the burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." Id. "Likewise, if the moving party seeks dismissal rather than conversion, or conversion rather than dismissal, the moving party should demonstrate why the requested alternative is in the best interests of the creditors and the estate" Id.

Once "cause" has been established, the burden shifts to the debtor to identify unusual circumstances that evince that conversion or dismissal is not in the best interest of creditors and the estate. Even, if there are no unusual circumstances, the court may not convert or dismiss a case if the debtor establishes and the court finds that: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the 'cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation; and (3) there is a reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time." In re Plaza Antillana, Inc., 2014 Bankr. Lexis 634, * 19 (Bankr. D.P.R. 2014) (quoting In re Orbit Petroleum, Inc. 395 B.R. 145, 148 (Bankr. D. N.M. 2008); see also; In re Material Mgmt., Inc., 2014 Bankr. Lexis 2342, *13 (Bankr. D.P.R. 2014); In re Costa Bonita Beach Resort, 513 B.R. 184, 195-196 (Bankr. D.P.R. 2014).

The court after finding cause and determining that relief under section 1112(b)(2) is inapplicable has broad discretion to determine whether conversion or dismissal is in the best

interest of creditors and the estate. See Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968 (B.A.P. 1st Cir. 2008); In re Colón Martinez, 472 B.R. 137, 145 (B.A.P. 1st Cir. 2012). "The standard for choosing between conversion or dismissal based on 'the best interests of creditors and the estate' implies application of a balancing test by the bankruptcy court." In re Costa Bonita Beach Resort, Inc., 513 B.R. at 196 (citing De Jounghe v. Lugo Mender (In re De Jounghe), 334 B.R. 760, 770 (B.A.P. 1st Cir. 2005); In re Staff Inv. Co., 146 B.R. 256, 260, (Bankr. E.D. Cal. 1992)).

11 U.S.C. §1112(b)(4)(A)

The UST requests dismissal or conversion of this case based upon 11 U.S.C. §1112(b)(4)(A). Section 1112(b)(4)(A) provides that cause includes, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §1112(b)(4)(A). This particular "cause" consists of two (2) requirements which must be satisfied. "First, it tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values. Second, it tests whether there is any reasonable likelihood that the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time. Both tests must be satisfied in order for cause to exist under this subparagraph to dismiss or convert the case under section 1112(b)(4)(A)." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy §1112.04[6][a] (16th ed. 2019). "Negative cash flow means that the estate's current liabilities are increasingly more rapidly than cash is available to pay as due. The result is dwindling liquidity, or illiquidity resulting in unpaid postpetition debts which usually constitute administrative expenses that will take priority over prepetition claims" Id.

-50-

*Financial analysis*

In this case, the Debtor's statement of income and accumulated deficit for the year ended April 30, 2012 discloses net income in the amount of $32,693. The Debtor for this year had an ending accumulated deficit of ($1,733,312) which is a negative retained earnings balance. During this period, the individual lease and property management agreements were not renewed upon the expiration of the initial ten-year period that expired on October 2012. These were the units in the condo hotel. The total revenues are in the amount of $2,705,660 and the operating costs and expenses are in the amount of $3,058,992. There is a line item for reimbursable expenses under property management agreements in the amount of $446,018 which decreases the operating costs and expenses resulting in net operating costs and expenses in the amount of $2,612,974 and thus income before interest expense is in the amount of $92,686.

The Debtor's balance sheet for the year ended April 30, 2012, discloses total current assets in the amount of $394,750. There is a separate line item for notes receivables, less allowance for doubtful accounts of $8,060,000, and the same is left blank (-). In the liabilities and shareholder's deficiency portion of the balance sheet, the total current liabilities are in the amount of $1,937,161 and the long-term debt is in the amount of $2,009. The shareholder's deficiency is in the amount of ($1,544,600), which theoretically means that the shareholders owe money. The current liabilities are comprised of the following: line of credit in the amount of $6,480; current portion of long-term debt in the amount of $585,355; accounts payable, including bank overdraft in the amount of $115,086 is in the amount of $463,806; accrued liabilities in the amount of $841,755 and guest deposits in the amount of $39,765. As to the accrued liabilities in the amount of $841,755 they are comprised of the following: room tax payable in the amount of

-51-

$320,345; accrued interest, penalties and surcharges in the amount of $452,414 and other accruals in the amount of $68,996. The notes to the financial statements disclose that the Debtor is in default with various loan payables in the amount of $587,364.

In this case, the Debtor's statement of income and accumulated deficit for the year ended April 30, 2013 disclose a net loss in the amount of ($134,758). The Debtor for this year had an ending accumulated deficit of ($1,868,071), which is a negative retained earnings balance. The total revenues are in the amount of $2,533,394 and the operating costs and expenses are in the amount of $2,818,799. There is a line item for reimbursable expenses under property management agreements in the amount of $227,665 which decreases the operating costs and expenses resulting in net operating costs and expenses in the amount of $2,591,134 and thus net loss before interest expense is in the amount of ($57,740).

The Debtor's balance sheet for the year ended April 30, 2013, discloses total current assets in the amount of $472,266. The line item for notes receivables, less allowance for doubtful accounts of $8,060,000 is left blank (-). In the liabilities and shareholder's deficiency portion of the balance sheet, the total current liabilities are in the amount of $2,236,978 and the long-term debt is in the amount of $0. The shareholder's deficiency is in the amount of ($1,764,710), which theoretically means that the shareholders owe money. The current liabilities are comprised of the following: line of credit in the amount of $41,352; current portion of long-term debt in the amount of $535,675; accounts payable, including bank overdraft in the amount of $81,997, is in the amount of $487,354; accrued liabilities in the amount of $1,122,530 and guest deposits in the amount of $50,065. The accrued liabilities in the amount of $1,122,530 are comprised of the following: room tax payable in the amount of $476,216; sales and use tax payable in the amount of $101,785; accrued interest, penalties and surcharges in the amount of $526,529 and other

accruals in the amount of $18,000. The notes to the financial statements disclose the Debtor is in default with various loan payables in the amount of $535,675.

The independent auditor's report for 2013 discloses the following: "[t]he accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discuss[ed] in Note 5, 8 and 9 to the financial statements, the Company has not been able to currently service its debts, which are past due; therefore, no assurance can be given that the Company will be successful in being able to meet its obligations in the normal course of business. Management's plan regarding those matters are described[d] in Note 9. Those conditions raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustment that might result from the outcome of this uncertainty." Note 9 of the financial statements reads as follows: "[m]anagement has continued its efforts to market the property to increase its business. However, no assurance can be given that the Company will be successful in being able to meet its obligations in the normal course of business mainly due to the uncertainty in the realization of the Company's main significant asset which is the notes receivable amounting to $8,060,000 which are past due and in default; as disclosed in Note 8."

The Debtor's statement of income and accumulated deficit for the year ended April 30, 2014 discloses a net income in the amount of $30,383. The Debtor for this year had an ending accumulated deficit of ($1,837,688), which is a negative retained earnings balance. The total revenues are in the amount of $2,062,669 and the operating costs and expenses are in the amount of $2,112,161. There is a line item for reimbursable expenses under property management agreements in the amount of $110,152 which decreases the operating costs and expenses

resulting in net operating costs and expenses in the amount of $2,002,009 and thus net income before interest expense is in the amount of $60,660.

The Debtor's balance sheet for the year ended April 30, 2014, discloses total current assets in the amount of $560,367. The line item for notes receivables, less allowance for doubtful accounts of $8,060,000 is left blank (-). The liabilities and shareholder's deficiency portion of the balance sheet shows that the total current liabilities are in the amount of $2,363,513 and the long-term debt is in the amount of $0. The shareholder's deficiency is in the amount of ($1,803,146), which theoretically means that the shareholders owe money. The current liabilities are comprised of the following: line of credit in the amount of $42,395; current portion of long-term debt in the amount of $495,941; accounts payable, including bank overdraft in the amount of $91,762, is in the amount of $455,520; accrued liabilities in the amount of $1,278,535 and guest deposits in the amount of $91,122. The accrued liabilities in the amount of $1,278,535 are comprised of the following: room tax payable in the amount of $458,27; sales and use tax payable in the amount of $127,784; accrued interest, penalties and surcharges in the amount of $663,243 and other accruals in the amount of $29,079. The notes to the financial statements disclose that the Debtor is in default with various loan payables in the amount of $495,941.

The independent auditor's report for 2014 discloses the following: "[t]he accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discuss[ed] in Note 5, 8 and 9 to the financial statements, the Company has not been able to currently service its debts, which are past due; therefore, no assurance can be given that the Company will be successful in being able to meet its obligations in the normal course of business. Management's plan regarding those matters are described[d] in Note 9. Those conditions raise substantial doubt about the Company's ability to continue as a going concern.

-54-

The financial statements do not include any adjustment that might result from the outcome of this uncertainty." Note 9 of the financial statements reads as follows: "[m]anagement has continued its efforts to market the property to increase its business. The Company is also dependent upon the outcome of the contingency disclosed in Note 11. However, no assurance can be given that the Company will be successful in being able to meet its obligations in the normal course of business mainly due to the uncertainty in the realization of the Company's main significant asset which is the notes receivable amounting to $8,060,000 which are past due and in default; as disclosed in Note 8. Refer also to Note 11[3]."

The court finds that the Debtor, even with the rental of the condo hotel units, absent any type of epidemic (such as zika and chikungunya) and no effects from mayor hurricanes, since the year 2012 was presenting a deteriorating financial panorama and this is evinced by the accumulated deficits for each year (2012-2014), the bank overdrafts for each year, the long term payables/notes that were in default and thus became a current liability. The independent auditor for the years ended April 30, 2013 and April 30, 2014, disclosed that the Company has been unable to service its past due debts, thus no assurance can be provided that the Debtor will be

---

[3] Note 11 of the April 30, 2014 financial statements provide the following: "[t]he Company is involved from time to time in various legal proceedings arising in the normal course of business. Management believes, based on the opinion of legal counsel, that the final disposition of these legal actions will not have a material effect on the Company's financial position or results of operations, except as disclosed below. On February 3, 2014, the Puerto Rico Tourism Company (hereinafter "Tourism") filed a legal claim against the Company in connection with past due debts related to room tax collected by the Company but not remitted to Tourism. As of December 31, 2013, Tourism is seeking to collect from the Company a total of $757,450 through a legal process to obtain the payment of the tax.

At the present time, the Company, through legal counsel, is disputing the amount claimed by Tourism. Counsel for both sides are negotiating, to establish the correct amount of the debt. The Company admits that there is a substantial obligation of unpaid room tax, but not in the amounts claimed in the complaint, basically attributed to a specific legal issue by which the Company contends that the 9% room tax should be assessed upon the basic cost of the room rental only and the same does not include service charges or resort fees.

As of December 31, 2013, the Company has accrued a total of $686,499, which includes the $228,072 presented in Note 5 as long-term debt in default, plus interest, penalties and surcharges of approximately $528,699" (Docket No. 1, pgs. 57-58, Independent Auditors' Report: pgs. 46-58).

able to meet its obligations in the normal course of business. Therefore, these pre-petition conditions raise substantial doubt as to the company's ability to continue as a going concern. The auditor did not express an opinion for any of the financial statements because they were not able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion.

The Debtor filed for bankruptcy on May 22, 2015. At the time of the bankruptcy filing, it had 14 villas/units to rent. After hurricane María on September 20, 2017 to the present, it has been operating with 8 units. The four (4) units at Casa Escondida, which are ocean front villas and sustained the most damage from the hurricane, have not been fixed/repaired. These units rent at a higher rate.

The Debtor's monthly operating reports from February 2018 up to and including June 2019 disclose that the hotel business' ending cash balances have been positive, except for July 2018 which resulted in a cash deficit of ($459.68) and May 2019 which resulted in a cash deficit of ($660.14). The high season in the hotel industry is during the months of November through April. The ending cash balances pursuant to the monthly operating reports for the following months were the following: November 30, 2018: $284.07; December 2018: $6,458, 92; January 2019: $2,897.39; February 2019: $7,162.32; March 2019: $15,772.58; April 2019: $1,238.34; May 2019: ($660.14); and June 2019: $4,689.19. CPA Rivera projected that the Debtor would have ending cash receipts in the amounts of $36,000 for December; $34,000 for January and $32,000 for the month of February.

The Debtor's high season ended in April 2019 with a cumulative ending cash balance of $1,238.34. Thus, the projections were unmet. Therefore, the Debtor's cash inflow from this high season will be insufficient to cover the negative cash flow during the upcoming low season.

In order to attain a more complete financial picture of how the Debtor's operations are performing, the ending cash balances must be analyzed jointly with the account payables balance for the same period. In the instant case, the account payables ending balance for February 2018 is in the amount of $68,182.23 and the accounts payable ending balance for April 2019 should be in the amount of $159,320.42.[4] According to the post-petition accounts payable included in the monthly operating reports a large percentage of the amount of its post-petition accounts payable is attributed to the power (PREPA) and water (PRASA) accounts payables.

The court is aware that the Debtor is objecting to the power charges in which PREPA invoiced the Debtor for the period of September 1, 2017 through February 2, 2018 the amount of $24,429.08 when it did not have power. However, the PREPA invoice reflects a prior balance of $27,446.14. The Debtor's accounts payables balance in February 2018 was in the amount of $68,182.23 and in April 2019, the ending balance is in the amount of $159,320.39. The court notes that for the months of February, March, May, June and December 2018, PRASA was not paid according to the Debtor's monthly operating reports. In addition, the Debtor did not pay PREPA the months of February, March, May, June, September, November and December 2018, March, April, May and June 2019 pursuant to the Debtor's monthly operating reports.

Mr. Wilhelm Sack testified that he received from the Debtor a monthly salary of four thousand "something" and that the hotel was not up to date paying his salary. He also stated that he did not know how much the hotel owes him. Pursuant to the monthly operating reports, Mr. Sack was not paid any wages during the months of May, October, November and December 2018. The August 2018 monthly operating report discloses that the June 22, 2018 check for Mr.

___

[4] The court notes that the accounts payable opening balance for the monthly operating report for the month of April 2018 should be the ending balance for the month of March 2018 which is in the amount of $74,577.10. The Debtor disclosed mistakenly that its April 2019 opening accounts payable balance was in the amount of $68,182.23 which is the opening balance for the month of March 2018 (Refer to Docket. No. 464, pg. 7 and Docket No. 463, pg. 7).

Sack's wages in the amount of $3,559.38 was voided. Mr. Sack's wages for the month of July 2018 was in the amount of $800; and for the month of August 2018 his wages paid were in the amount of $890; and for the month of September 2018 his wages were in the amount of $833.10. Pursuant to the monthly operating reports, Mr. Sack's wages for the months of February and March 2019 were each in the amount of $1,773.32 and for the month of April 2019 his wages were in the amount of $3557.87. According to the monthly operating reports, Mr. Sack's wages for the months of May and June 2019 have been $0. The monthly operating reports show that Mr. Harold Davies was paid for consulting services in the month of March 2018, the amount of $12,000 and he has been paid at least $2,000 for consulting services for the months thereafter until March 2019.

CPA Rivera testified that his name appears on the September 2018 check register because the Debtor was paying his accounting fees as part of a payment plan. At the time of the hearing, CPA Rivera's most recent fee application was filed on March 20, 2018 (Docket No. 458) for the period of June 9, 2017 to March 19, 2018 in the amount of $26,220.64. The same was withdrawn on March 22, 2018 (Docket No. 459). CPA Rivera testified that he was not aware that the application had been withdrawn. Subsequently, CPA Rivera filed an application for compensation on November 5, 2018 for the period of October 25, 2017 to March 6, 2018 for $19,565.94 and the same was granted on November 30, 2018 (Docket Nos. 524 & 531). As of this date, CPA Rivera has not filed an application for compensation for professional services rendered after March 6, 2018.

The Debtor's attorney filed the most recent application for compensation on November 2, 2018, for the period of November 1, 2017 to September 30, 2018 in the amount of $37,337.50. The same was granted on December 3, 2018 (Docket No. 522 & 534). On November 5, 2018, the

Debtor's special counsel filed an application for compensation for the period of March 1, 2018 to July 31, 2018 in the amount of $3,375 and the same was granted on November 30, 2018 (Docket Nos. 523 & 530). The summation of the most recent applications for compensation that the court has granted amounts to $60,278.44. The court notes that pursuant to the monthly operating reports, the Debtor's attorney has only been paid $600 in legal fees from November 1, 2018 until June 30, 2019. The summation of the professional fees disbursed in line K of the Debtor's monthly operating reports for the months of November 2018 through June 2019 amounts to $24,064.21.

Prior to the Debtor's attorney application for compensation filed on November 2, 2018, the Debtor's attorney filed applications for compensation on March 21, 2017 for the period of October 1, 2016 to March 13, 2017 in the amount of $32,937.50 and expenses in the amount of $426.30 (Docket No. 336) and on August 7, 2017 for the period of March 1, 2017 to July 31, 2017 in the amount of $21,512.50 and expenses in the amount of $188.46 (Docket No. 399). These two applications for compensation were granted on April 19, 2017 and September 1, 2017 (Docket Nos. 351 & 411). Pursuant to the Debtor's March 2018 check register included as part of the monthly operating report, the Debtor's attorney was rendered a check dated March 27, 2018 in the amount of $45,000 and the purpose is "accounts payable legal." Also, in that month, CPA Pedro Rivera was rendered a check dated March 27, 2018 in the amount of $20,000 and the purpose is "accounts payable- accounting."

The court finds that the Debtor has understated its accounts payables in its monthly operating reports, in particular the legal fees and the accounting fees payable and the wages payable of Mr. Sack. In addition, there are several months in which the Debtor did not pay any monies for its water and power service. On January 19, 2018, this court issued an opinion in

which it held that the Puerto Rico Tourism Company is not barred from collecting the amount of $228,072.47. In addition, the Puerto Rico Tourism Company's claim for principal, interest and surcharges from March 2004 through February 2009 and the amounts subsequent to that date are not time barred. Therefore, the Puerto Rico Tourism Company's claim is in the amount of $1,113,173.47 (principal and interests) pursuant to 11 U.S.C. §507(a)(8), and the remainder $95,316 for surcharges is a general unsecured claim (Docket No. 448). As to the priority claim for transfer taxes owed to the Puerto Rico Tourism Company, CPA Rivera testified that he does not think that the Debtor will not be able to pay $1.4 million in priority claims by May 2020.

The court also finds that even if the Debtor did not have to pay the $1.4 million priority claim by May 2020 pursuant to 11 U.S.C. §1129(a)(9)(C), its hotel business does not generate enough money to pay its operational expenses and this is evidenced by the understatement of the Debtor's accounts payables and the continuous increase in accounts payable which indicates a cash deficiency. Time has proven that CPA Rivera's projections were overly optimistic as the Debtor's ending cash balance as of April 30, 2019 is $1,238. "Negative cash flow means that the estate's current liabilities are increasingly more rapidly than cash is available to pay as due. The result is dwindling liquidity, or illiquidity resulting in unpaid postpetition debts which usually constitute administrative expenses that will take priority over prepetition claims." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy §1112.04[6][a] (16th ed. 2019). This is exactly the Debtor's financial scenario. The monthly operating reports evince that the Debtor is in reality operating at an operational loss because it has not paid regularly its basic monthly operating costs such as the power and water bills, the general manager's salary, the accounting and legal fees. The Debtor has also understated its accounts payables as previously stated. The court concludes that the Debtor does not have a profitable business operation around which to

-60-

structure its reorganization effort. Therefore, the court finds that the UST has shown by a preponderance of the evidence that the Debtor has suffered and continues to experience a negative cash flow. The Debtor's operations do not generate enough income to be able to cover its operating expenses.

The Debtor filed its disclosure statement and plan of reorganization on February 14, 2016 (Docket Nos. 142 & 143). The Debtor has not been able to confirm said plan. Moreover, the Debtor's proposed payment of claims under section 11 U.S.C. §507(a)(8) included in the disclosure statement includes monthly payments of $10,552 for the first four (4) years of the plan. The Debtor disclosed that the amount allowed for all the section 507(a)(8) claims would be in the amount of $499,372, allocating the amount of $237,211 to the Puerto Rico Tourism Company (Docket No. 142-4). Consequently, even if the amount allowed for the Puerto Rico Tourism Company was $237,211, this would result in monthly payments of approximately $21,564, an amount which does not take into account the payment for the other priority claims, the general unsecured claims, and the additional costs of repairing the four (4) properties in Casa Escondida that were damaged by the hurricane. "A debtor who is unable to service its debt at the outset of the case and remains unable to do so for the foreseeable future does not have a reasonable likelihood of rehabilitation." See In re Creekside Senior Apt., L.P., 489 B.R. 51, 62 (quoting In re Fall, 405 B.R. 863, 869 (Bankr. N.D. Ohio 2009)). There is no reasonable likelihood of rehabilitation, unless the Debtor is able to pay its priority claims in a plan of reorganization.

The court finds that it is unlikely that the Debtor will recover any monies from the account receivable in the amount of approximately $8 million that it has had in its books since the year 2005 from ITC. As of April 30, 2012, the Debtor's balance sheet discloses a separate

line item for notes receivables, less allowance for doubtful accounts for $8,060,000 and the same is left blank (-). Moreover, Mr. Bechara, ITC's president testified that ITC is completely insolvent, meaning it does not generate income and thus is unable to pay any monies owed to the Debtor. Mr. Bechara testified that the last time he sold a unit was three or four years ago and since that time ITC has not had any other source of income. Therefore, the Debtor's chances on any recovery of this account receivable is simply illusory. For these reasons, the court concludes that there is an absence of a reasonable likelihood of rehabilitation, and thus the second prong of section 11 U.S.C. §1112(b)(4) has been satisfied. Thus, the UST has made the requisite showing to establish cause to grant his motion under 11 U.S.C. §1112(b)(1) to convert or dismiss the case.

The next step in the analysis is to determine whether there are "unusual circumstances" that indicate that converting or dismissing the case is not in the best interests of creditors and the estate pursuant to 11 U.S.C. §1112(b)(2). By its own terms, 11 U.S.C. §1112(b)(2) provides that the "unusual circumstances" exception does not apply if the cause for dismissal or conversion is a "substantial or continuing loss to or diminution of the estate," pursuant to 11 U.S.C. §1112(b)(4)(A). See In re Creekisde Senior Apts., L.P., 489 B.R. at 63; See also In re Landmark Atl. Hess Farm, 448 B.R. 707, 717 (Bankr.D. Md. 2011). In the instant case the "unusual circumstances" exception does not apply because the court held that cause was established pursuant to 11 U.S.C. §1112(b)(4)(A).

*The §1112(b)(1) standard applied*

Courts have generally considered several factors in order to determine whether dismissal or conversion is in the best interest of creditors and the estate such as:

-62-

"(1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors; (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a "single asset," (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a plan has been confirmed and whether any property remains in the estate to be administered, and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns." See Alan N. Resnik & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[7] (16th ed. 2019).

In the instant case the UST did not argue which option, dismissal or conversion, was in the best interests of creditors and the estate. Notwithstanding, the evidence before the court and the monthly operating reports show that the Debtor's post-petition accounts payables continues to increase. Moreover, the Debtor's business operations are not viable because they do not generate enough income to cover basic administrative and operating expenses. In addition, the court concluded that the Debtor collecting on the account receivable for sale of property to ITC dated July 2005 in the amount of $8,080,000 is highly unlikely and will not occur within the near future. At this juncture, there is pending litigation in state court regarding the rank of the usufruct lien and the mortgage liens held by PRCI. PRCI's two mortgage notes are secured by the hotel property and the outstanding principal balance as of October 2018 was in the amount of $7,087,00 plus accrued interest balance in the amount of $2.9 million plus attorney's fees and other fees which amount to a total of $10.1 million. The court further finds that the hotel property suffered damages from Hurricane María as evidenced by the photos, in particular the ocean front villas and the sea wall that was damaged in some areas. As to the property value, Ms. Payano testified that she saw an appraisal that PRCI inherited from Banco Popular, it was either

-63-

from the year 2014 or 2015, and the value was approximately $2.5 million, although she does not recall whether it was market value or liquidation value. She stated that the appraisal was for the nine (9) individual villas owned by PRCI. In addition, Mr. Bechara testified that before the hotel property was worth around $6 million and now, the value of the property is approximately $2 to $3 million, given the damages suffered. PRCI's mortgage liens are approximately $10.1 million, without including the value of the Debtor's usufruct lien. Irrespective, of the ranking of the mortgage liens and the usufruct lien, the real property lacks equity. If title to the real property were to revert back to the Debtor due to ITC's failure to comply with the two (2) promissory notes which required the payment of $8,060,000 in two installments and which constituted part of the purchase price, then the usufruct lien would be cancelled, and the property would remain encumbered with the two mortgage notes in the amount of $10.1 million, leaving the Debtor's potential real estate asset under water. Thus, the court concludes that the case should be dismissed for the reasons stated herein.

Lastly, creditors Domenech and Ferraiouli in their *Motion Joining Request for Dismissal* request a bar to re-file of no less than two (2) years pursuant to 11 U.S.C. §§105(a) and 349(a) (Docket No. 543). Their request is based upon, "… the fact that this case has been lingering for four years without having a disclosure statement approved is sufficient cause, by itself, to warrant a re-filing bar. The appearing creditors posit that, having Debtor been under the protection of the Bankruptcy Code for almost four years without having come closer to achieving its reorganization, the dismissal of this case should have a re-filing bar of no less than two years" (Docket no. 543, pgs. 7-8). The Debtor in its *Opposition to Motion to Dismiss* argues that: (i) the claimants have failed to plead proper cause for a bar to refile which is an extraordinary remedy; (ii) failure to approve a disclosure statement is not an extreme situation, nor constitutes contumacious conduct; and (iii) the approval of the Debtor's disclosure statement was held in abeyance at the request of the creditors (Docket No. 547). The creditors in their *Reply to "Opposition to Motion to Dismiss"* request the bar to refile premised on the Debtor's lack of

ability to collect any monetary judgment against ITC and also lack the ability to sell the usufruct or hotel property. Therefore, the bar to re-file is appropriate because it will frustrate the ability of any of the creditors to collect on their debts (Docket No. 556).

11 U.S.C. §349(a) provides, "[u]nless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title."

The court notes that section $109(g)^5$ does not apply to corporate debtors. The general rule under section 349(a) is that dismissal of a case is without prejudice, meaning that it does not impair the ability of a debtor to seek future bankruptcy relief. However, the court is given the discretion for "cause" to order otherwise. "Thus, when dismissal is predicated on grounds that would justify barring the debtor from discharge in the dismissed case or in a subsequent case, the court has the power to dismiss a case with prejudice. This rule must be limited by the requirements of due process." See Alan N. Resnik & Henry J. Sommer, 3 Collier on Bankruptcy ¶349.02[2] (16th ed. 2019). "So the majority view is that Section 109(g) and Section 349(a) are entirely reconcilable with one another. The former is specifically aimed at preventing serial filers from bogging down the bankruptcy process; the latter is a more general provision that allows bankruptcy judges to bar refiling when there is otherwise good cause for doing it. In other words, bankruptcy courts are authorized to bar refilings beyond the 180 days set forth in Section 109(g) under either Section 349(a), authorizing the court to bar refilings 'for cause,' or

---

[5] 11 U.S.C. §109(g) provides: "[n]otwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—

(1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case, or

(2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title." 11 U.S.C. §109(g).

Section 105(a), authorizing courts to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title… or prevent an abuse of process'" B-3 Props., LLC v. Lasco, 517 B.R. 889, 897 (Bankr. N.D. Ind. 2014) citing Casse v. Key Bank Nat'l Ass'n (In re Casse), 198 F. 3d 327, 340-341 (2nd Cir. 1999).

A dismissal with prejudice and a bar to refile are different remedies. A dismissal with prejudice determines whether debts owed at the time of the original bankruptcy petition can be discharged. A bar to refile determines whether the debtor will have access to the bankruptcy court in the future.

The creditors request for a bar to refile for two years is based upon the fact that the case has been lingering for four years without having a disclosure statement approved and the Debtor's inability to be able to collect on a monetary judgment against ITC.

The court finds that under the totality of the circumstances in the case at bar, the creditors request falls short of meeting the requirement "for cause" under section 349(a) based upon a Debtor's first bankruptcy filing in which there was extensive litigation and other external factors such as Hurricanes Irma and María which might have contributed to the dismissal of the same. In addition, there has not been any allegations regarding that the petition was filed in bad faith and for no legitimate bankruptcy purpose. Therefore, the creditors request under section 349(a) for a bar to refile of two years is denied.

Conclusion

For the foregoing reasons, the court finds that the UST met its burden of proving cause by a preponderance of the evidence to grant its motion to convert or dismiss under 11 U.S.C. §1112(b)(4)(A) and determines that it is in the best interest of creditors and the estate to dismiss the instant case. The creditors request under section 349(a) for a bar to refile of two years is denied.

SO ORDERED.

In San Juan, Puerto Rico, this 9th day of August, 2019.

Enrique S. Lamoutte
United States Bankruptcy Judge